# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MONTAGUE MINNIFIELD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:16-CV-00196-MHH** |
| | ) | |
| **CITY OF BIRMINGHAM, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Montague Minnifield worked as a police officer for the Birmingham Police Department.  According to Mr. Minnifield, the City of Birmingham and Sergeant Heath Boackle, the defendants in this case, discriminated against him because he is African-American, and they retaliated against him for filing multiple internal grievances and charges of discrimination with the EEOC.  Mr. Minnifield brings Title VII claims of disparate treatment, retaliation, and hostile work environment against the City.  Mr. Minnifield brings § 1983 claims of disparate treatment and retaliation in violation of § 1981 against the City and Sgt. Boackle in his individual capacity.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants ask the Court to enter judgment in their favor on all of Mr. Minnifield's claims against them.  (Doc. 41).  The defendants also ask the Court to strike all or part of

six affidavits which Mr. Minnifield submitted in response to the motion for summary judgment. (Doc. 65). For the reasons explained below, the Court denies the defendants' motion to strike, and the Court grants in part and denies in part the defendants' motion for summary judgment.

## I.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). The Court describes the evidence in the summary judgment record accordingly.

2

## II.    FACTUAL BACKGROUND

### A.    <u>Mr. Minnifield's Employment History with the City and his First Grievances, EEOC Charge, and Lawsuit</u>

Mr. Minnifield started working as a police officer for the Birmingham Police Department (BPD) in 1997.  (Doc. 57-1, p. 11).  In 2009, Mr. Minnifield applied for transfer to the Tactical Unit within BPD.  (Doc. 57-1, pp. 12-13).  The Tactical Unit is "comprised of Solo Motorscouts, Mounted Patrol, Freeway Patrol, Hit and Run, Patrol K-9 Teams, Airport (TSA) K-9 Teams, and Warrant Details."  (Doc. 57-11, p. 1).  Because the City denied him a position in the Tactical Unit, Mr. Minnifield filed a grievance with the Personnel Board of Jefferson County.  (Doc. 57-1, p. 13; Doc. 58-13, p. 1).

On October 26, 2009, the City transferred Mr. Minnifield to the Tactical Unit.  (Doc. 57-1, p. 32; Doc. 48, p. 26).  As a member of the Tactical Unit, Mr. Minnifield tried repeatedly to obtain particular assignments within the unit.  This lawsuit pertains to his efforts in 2013, but a brief review of Mr. Minnifield's previous efforts helps set the stage for the events in 2013.

In 2009, Mr. Minnifield selected the TSA K-9 Unit as his first choice and the Motorscout Unit as his second choice for assignment in the Tactical Unit. (Doc. 57-1, p. 33).  The City assigned him to the Freeway Unit instead.  (Doc. 57-1, p. 33).  On August 13, 2010, BPD certified that Mr. Minnifield completed a course in basic police motorscout school, but BPD did not honor the certification.

(Doc. 57-1, p. 34; Doc. 58-11).  On August 11, 2011, based on his inability to

obtain an assignment in the motorscout section or the K-9 section of the Tactical

Unit, Mr. Minnifield filed a second grievance with the Personnel Board.  (Doc. 57-

1, p. 34).

Just before Mr. Minnifield filed his second grievance, the Commander of the

Tactical Unit announced a vacancy in the TSA K-9 Unit.  (Doc. 58-13, p. 2).  On

December 8, 2011, Sgt. Heath Boackle sent Mr. Minnifield a memo which stated

that BPD placed Mr. Minnifield on a list of eligible candidates and was

considering him for the TSA K-9 position.  (Doc. 59-19).[1]  On December 26, 2011,

the City awarded Officer Larry Phillips, who is white, the TSA K-9 position.

(Doc. 58-12, p. 1).

Mr. Minnifield filed an EEOC charge of race discrimination and retaliation

based on the City's promotion of Officer Phillips to the TSA K-9 position and the

City's failure to honor Mr. Minnifield's motorscout certification.  (Doc. 58-12, p.

1).  In 2014, after the EEOC sent Mr. Minnifield a right to sue letter, he brought a

lawsuit in which he asserted Title VII and § 1983 claims of racial discrimination

and retaliation against the City.  *Minnifield v. City of Birmingham*, Case No. 2:14-

---

[1] The parties dispute Sgt. Boackle's race.  Sgt. Boackle and Chief A.C. Roper, the Chief
of Police for the City of Birmingham, state that Sgt. Boackle is Arabic-American, and his skin is
brown.  (Doc. 58-5, pp. 105-06; Doc. 59-23, p. 154).  Mr. Minnifield argues that Sgt. Boackle's
birth certificate (Doc. 57-5), a police officer applicant summary sheet (Doc. 57-6), an applicant
information form (Doc. 57-14), and a photograph of Sgt. Boackle (Doc. 57-7) demonstrate that
Sgt. Boackle is white.   (Doc. 56, p. 5, ¶ 20).   Sgt. Boackle contests Mr. Minnifield's
interpretation of each piece of evidence.  (Doc. 66, p. 3, ¶ 20).

cv-789-KOB. The presiding judge entered judgment for the City on Mr. Minnifield's § 1983 and Title VII disparate treatment claims and denied summary judgment on Mr. Minnifield's Title VII retaliation claim regarding the City's failure to give Mr. Minnifield a motorscout position. (Doc. 65-1, pp. 1, 22).

The parties reached a settlement agreement in which Mr. Minnifield released "[a]ny and all claims which were made or which could have been made in [the lawsuit]." (Doc. 14-2, p. 3, ¶ 6.a). Pursuant to the settlement agreement, Mr. Minnifield reserved "the right to pursue claims and/or file suit for any acts and omissions, and any related consequences and/or damages, for all acts or omissions not alleged in [the lawsuit]." (Doc. 14-2, p. 1, ¶ 2).

B.    Mr. Minnifield's Subsequent Efforts to Receive a K-9 Assignment

After Mr. Minnifield lost the available TSA K-9 position to Officer Phillips in December 2011, Mr. Minnifield pursued another K-9 position. (Doc. 57-1, p. 37). On January 5, 2012, Mr. Minnifield met with Chief Roper and Captain Henry Irby and complained because he had been waiting two years in the Tactical Unit for a TSA K-9 position. (Doc. 57-13, p. 1). On January 6, 2012, Mr. Minnifield met with Captain Richard Davis and Sgt. Boackle. (Doc. 57-13, p. 1). At the meeting, Capt. Davis and Sgt. Boackle offered Mr. Minnifield a dual purpose K-9, meaning a dog trained in both apprehension and explosives detection. (Doc. 57-13, p. 1). Ordinarily, police dogs are trained either for patrol to apprehend and bite

suspects, (Doc. 58-5, p. 126), or for explosives detection, (Doc. 58-5, p. 124). In theory, the dual purpose K-9 position would provide a 5% pay increase for Mr. Minnifield because every officer who handles an explosives dog receives a 5% raise. (Doc. 57-13, p. 1; Doc. 58-5, pp. 143-44).

The dual purpose K-9 position was hypothetical. (Doc. 57-1, pp. 142, 175). In January 2012, no dog in the K-9 unit could work both patrol and detect explosives. (Doc. 58-5, p. 126). Though it is possible to train a patrol K-9 to detect explosives, no dog in the K-9 unit served both purposes under Sgt. Boackle's supervision because of liability concerns. (Doc. 58-5, p. 126). BPD did not post a vacancy announcement for a dual purpose K-9, and Chief Roper did not approve a dual purpose K-9. (Doc. 57-1, p. 142).

Mr. Minnifield rejected the offer for the dual purpose K-9 because he was not interested in handling a patrol K-9. (Doc. 57-13, p. 1).[2] Instead, Mr. Minnifield wanted the TSA K-9 position the City had promised him but gave to Larry Phillips. (Doc. 57-1, pp. 142-43; Doc. 57-13, p. 1). Mr. Minnifield felt that the TSA K-9 was his "rightful position" because he had been waiting two years for the position. (Doc. 57-13, p. 1). Mr. Minnifield asked that BPD give the hypothetical dual purpose K-9 position to Larry Phillips and give him (Mr. Minnifield) the TSA K-9 position. (Doc. 57-1, pp. 176-77; Doc. 57-13, p. 1).

---

[2] Sgt. Boackle testified that Mr. Minnifield rejected the offer because Mr. Minnifield did not want a "biting dog." (Doc. 58-5, p. 121).

Capt. Davis refused Mr. Minnifield's request and ordered him to report to the K-9 unit's abbreviated handler's course on January 9, 2012. (Doc. 57-1, p. 176; 57-13, p. 1).

In an email sent to Chief Roper on January 8, 2012, Mr. Minnifield described the meeting with Capt. Davis and Sgt. Boackle:

> Hello Chief Roper. This is an update from the meeting I had with Capt. Richard Davis and Sgt. Heath Boackle on 01/06/2012 at 1200hrs. Capt. Richard Davis stated that this meeting was in reference to the meeting between you and me on 1/05/2012 at 1130hrs in the presence of Capt. Henry Irby. In the meeting with Capt. Richard Davis and Sgt. Heath Boackle I was given two options for a K-9 position[:] (A) Sgt. Heath Boackle would try to get me into the same TSA K-9 school with Officer Larry Phillips, but if that fails I would have to wait on the next TSA school and would also have to wait on a 6th TSA position to be created whenever the airport does an expansion at an unknown date or possibly never. (B) To take a dual purpose dog (Patrol and Bomb capable) with the 5% pay increase for the bomb distinction and attend a TSA handler class for the TSA certification, but not actually work the airport. I was also informed that I would have to attend and pass an abbreviated handler class conducted by Sgt. Heath Boackle which is not a requirement for the TSA Handler position. I informed Capt. Richard Davis and Sgt. Heath Boackle that both options were unacceptable and at the present time I have no interest in handling a patrol K-9 at this time, and advised the two that they should assign Officer Larry Phillips the dual purpose K-9 and allow me to assume my rightful position as a TSA K-9 Handler which I have awaited assignment to for over 2 years in the Tactical Swat Unit. Sgt. Heath Boackle stated that you had informed him that you would attempt to add a 6th TSA slot immediately by contacting TSA and making the request. At this time I was given an order by Capt. Richard Davis to report to the K-9 unit at the range on 01/09/2012, for a change in assignment to the K-9 Unit to begin the abbreviated K-9 Handler class instructed by Sgt. Heath Boackle.

(Doc. 57-13, p. 1). As it turns out, there was no formal dog training that week. (Doc. 58-5, p. 112). Instead, Mr. Minnifield trained with the K-9 Unit on at least two occasions for approximately four hours. (Doc. 58-5, pp. 111-12). After working with Sgt. Boackle's K-9 unit for approximately one week, Mr. Minnifield returned to the freeway unit. (Doc. 57-1, pp. 51, 97).

C.    2012 Patrol K-9 Vacancies

In the fall of 2012, Sgt. Boackle posted to all Tactical Unit members an announcement of a vacant patrol K-9 position. (Doc. 57-2). The announcement stated that eligible candidates must be assigned to the Tactical Unit. (Doc. 57-2). The announcement did not state that eligible candidates must train with the K-9 unit. (Doc. 57-2). Mr. Minnifield applied for the position. (Doc. 57-1, p. 156; Doc. 58-5, p. 152). Sgt. Boackle left the position vacant through the end of 2012. (Doc. 58-5, p. 175).

In February 2013, Lieutenant James Blanton, the commander of the Tactical Unit, posted to all commands an announcement of vacancies within the Tactical Unit. (Doc. 57-9, p. 1). The announcement included TSA K-9 and Patrol K-9 positions. (Doc. 57-9, p. 1). The announcement stated that eligible candidates "[m]ust be able to complete the Tactical Unit's physical assessment . . ." and "[m]ust be able to successfully pass the Birmingham Tactical Unit's Basic SWAT school." (Doc. 57-9, p. 1). In March 2013, Lt. Blanton posted to all commands a

nearly identical announcement of vacancies that listed the same eligibility criteria. (Doc. 57-10, p. 1).[3]

At some point before March 1, 2013, Sgt. Boackle sent a memo to Chief Roper in which he recommended Officers Justin Rosomme, Charles Hayes, Terry Davis, Jonathan Evans, and Metz Davis, all of whom are white, for patrol K-9 positions. (Doc. 57-22, p. 2; Doc. 58-5 pp. 193-94).[4] In June or July 2013, Chief Roper, who made the ultimate hiring decisions for BPD, selected Officers Charles Hayes, Justin Rosomme, and Metz Davis for the available patrol K-9 position. (Doc. 50, p. 4). None of the three officers passed a Birmingham SWAT school. (Doc. 57-25, p. 10; Doc. 58-1, p. 20; Doc. 58-2, p. 31). None of the three officers passed the Tactical Unit's physical assessment. (Doc. 57-25, p. 10; Doc. 58-1, p. 20; Doc. 58-2, p. 28).[5]

---

[3] Sgt. Boackle testified that he was not aware of either 2013 vacancy announcement. (Doc. 58-5, p. 182).

[4] In the memo, Sgt. Boackle stated that the five officers he recommended "continuously showed up for training over the past six months." (Doc. 57-22, p. 2). The memo passed up through the chain of command before Chief Roper filled any positions. (Doc. 58-5, p. 250). Each officer in the chain of command is African-American. (Doc. 58-5, pp. 250-51).

[5] In 2012 and 2013, the K-9 unit was under the umbrella of the Tactical Unit. (Doc. 43, p. 4, ¶ 9; Doc. 56, p. 24, ¶ 138; (Doc. 58-5, pp. 79, 82). R&R 117-33, one of the Rules & Regulations that the Chief of Police issues for the BPD, states that the Tactical Unit is comprised of seven different units, including Patrol K-9 Teams and Airport (TSA) K-9 Teams. (Doc. 57-3, p. 1, ¶ I; Doc. 59-23, p. 31). According to R&R 117-33, all Tactical Unit officers must have three years of service with BPD, successfully complete the Tactical Unit's physical assessment, and pass a Birmingham Police SWAT school. (Doc. 57-3, p. 1, ¶¶ A.1 & 3). Mr. Minnifield contends that because the City placed the K-9 unit within the Tactical Unit, officers in the K-9 unit had to comply with the Tactical Unit rules. (Doc. 57-1, pp. 115-16, 153; Doc. 59-13, pp. 12-

D. **Mr. Minnifield's EEOC Charge Regarding the 2013 Patrol K-9 Position**

On December 19, 2013, Mr. Minnifield filed a charge of discrimination with the EEOC. (Doc. 15-1, p. 2). In this charge, Mr. Minnifield alleged that the City discriminated against him based on his race by failing to promote him to a patrol K-9 position and by promoting three white males to patrol K-9 positions. (Doc. 15-1, p. 3). In addition, Mr. Minnifield alleged that the City failed to promote him to a patrol K-9 position in retaliation for his previously filed grievances, EEOC charges, and "federal complaints for race discrimination and retaliation." (Doc. 15-1, p. 3).

E. **The 2015 TSA K-9 Position**

While his EEOC charge was pending, in January 2014, Mr. Minnifield suffered injuries from a motorcycle accident. (Doc. 57-1, p. 20). After the accident, Mr. Minnifield could not work as a motorscout or "go out in the field." (Doc. 57-1, p. 21). The City placed Mr. Minnifield on limited duty because he could perform only administrative functions as a desk officer. (Doc. 57-1, p. 21). Mr. Minnifield remained disabled until he retired from BPD on July 9, 2015.

---

14). Therefore, to become a member of the K-9 unit, an officer had to complete the Tactical Unit's physical assessment and pass a Birmingham SWAT school. (Doc. 57-1, p. 116; Doc. 57-3, p. 1, ¶¶ A.1 & 3; Doc. 58-3, pp. 14-15; Doc. 58-23, pp. 18, 40). The defendants argue that under the K-9 Unit's own rules and regulations, K-9 handlers did not have to pass the Tactical Unit's physical assessment or SWAT school. (Doc. 43, pp. 4-6, ¶¶ 12-15; Doc. 50, p. 14; Doc. 58-5, p. 273; Doc. 59-23, pp. 134-35, 139).

(Doc. 57-1, p. 22).

On January 12, 2015, the K-9 unit separated from the Tactical Unit. (Doc. 57-1, p. 148; Doc. 58-5, pp. 78, 208). In April 2015, Sgt. Boackle selected Officer Larry McGhee, who is white, for a vacant TSA K-9 position. (Doc. 57-1, p. 139; Doc. 58-5, pp. 206-07). No vacancy announcement for a 2015 TSA K-9 position appears on the record, though Sgt. Boackle posted a vacancy announcement for a separate patrol K-9 position in 2015. (Doc. 48, p. 107).[6]

F.    Mr. Minnifield's Present Lawsuit

On November 4, 2015, following his retirement, the EEOC sent Mr. Minnifield a right to sue letter regarding his 2013 charge. (Doc. 15-2, p. 2). Mr. Minnifield filed this lawsuit on February 2, 2016. (Doc. 1). Mr. Minnifield amended his complaint on June 3, 2016. (Doc. 15). He asserts claims related to both the 2013 K-9 openings and the 2015 TSA K-9 opening. Following discovery, the defendants filed their motion for summary judgment. (Doc. 41). Mr. Minnifield filed his brief in opposition to the motion for summary judgment. (Doc. 56). The defendants filed a motion to strike exhibits attached to Mr. Minnifield's opposition brief (Doc. 65). The defendants' motion for summary judgment and their motion to strike are ripe for disposition.

---

[6] Sgt. Boackle testified that he selected Officer McGhee because Officer McGhee had served as a K-9 handler for 12 or 13 years, and his patrol dog had to retire. (Doc. 58-5, pp. 206-07).

## III. ANALYSIS

### A.  <u>The Defendants' Motion to Strike</u>

The defendants ask the Court to strike all or part of six affidavits which Mr. Minnifield submitted in support of his opposition to the defendants' motion for summary judgment.  (Doc. 65, p. 1).  The defendants should have raised their objections in their reply brief.[7]  The Court construes the defendants' motion to strike as an objection under Rule 56(c)(2).  *See Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1291 (N.D. Ala. 2013), *aff'd*, 767 F.3d 1124 (11th Cir. 2014) (treating motion to strike as an objection).

Objections under Rule 56(c)(2) function like trial objections adjusted for the pretrial setting, and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c)(2) advisory committee's note (2010 amendments).  Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an inadmissible form at the summary judgment stage.  Under the Rule, a district court

---

[7] Effective December 1, 2010, motions to strike summary judgment evidence no longer are appropriate.  *See* Fed. R. Civ. P. 56(c)(2) advisory committee's note (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily . . . ."). Pursuant to Federal Rule of Civil Procedure 56(c)(2), at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Accordingly, objections to evidence supporting or opposing a motion for summary judgment should be made in the objecting party's responsive brief.

may for example "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)). A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2). *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

### 1.    Affidavits of Ron Jennings and Alex Thomas (Doc. 58-9)

The defendants object to the identical affidavits of Officers Ron Jennings (Doc. 58-9, p. 1) and Alex Thomas (Doc. 58-9, p. 2) on the grounds that the affidavits are inadmissible hearsay and irrelevant. (Doc. 65, p. 4, ¶ 3). In the affidavits, Officer Jennings and Officer Thomas state that on November 21, 2011, they heard Chief Roper tell Mr. Minnifield that he should have a TSA K-9 position when the position is open if "they" told him he could have it. (Doc. 58-9, pp. 1-2).

Mr. Minnifield may avoid a hearsay objection at trial by calling Officer Jennings, Officer Thomas, or Chief Roper as witnesses. Moreover, the statements from Chief Roper may be admissible at trial as an opposing party's statements or on cross-examination as prior statements. *See* Fed. R. Evid. 801(d). The statements could demonstrate Mr. Minnifield's standing to receive a position in the

K-9 Unit relative to other candidates and could thus make a material "fact more or less probable than it would be without the evidence . . . ." Fed. R. Evid. 401. Therefore, the Court overrules the defendants' objections to the affidavits of Ron Jennings and Alex Thomas.

### 2.    Affidavit of James Lyons (Doc. 58-18)

Next, the defendants object to the affidavit of Officer James Lyons (Doc. 58-18) on the grounds that statements in the affidavit are inadmissible hearsay, irrelevant, and pertain to a previous lawsuit. (Doc. 65, pp. 4-7, ¶¶ 1-14). In the affidavit, Officer Lyons states that he heard supervisors discuss Mr. Minnifield's potential assignment to the K-9 Unit, how they needed to control the amount of grievances filed, and the administrative standing of the K-9 Unit. (Doc. 58-18, pp. 1-3, ¶¶ 3-6, 9-14). Officer Lyons states that he heard Officer Metz Davis discuss his inability to pass SWAT school. (Doc. 58-18, p. 3, ¶ 15). Officer Lyons states that he heard Officer Laquinte Louis discuss training with the K-9 Unit. (Doc. 58-18, pp. 3-4, ¶ 16).

Mr. Minnifield may avoid a hearsay objection at trial by calling Officer Lyons, Officer Davis, Officer Louis, or any of the supervisors mentioned in Officer Lyons's affidavit as witnesses. Moreover, the statements made by the supervisors may be admissible at trial as an opposing party's statements or on cross-examination as prior statements. *See* Fed. R. Evid. 801(d). While Officer Lyons's

affidavit could have constituted evidence in Mr. Minnifield's prior lawsuit, the affidavit could provide background information about the supervisors' knowledge of Mr. Minnifield's grievances, a material issue. Officer Davis's and Officer Louis's statements are relevant to their qualifications, a material issue. Therefore, the Court overrules the defendants' objections to the affidavit of James Lyons.

### 3. Affidavit of Ronald Jennings (Doc. 58-19)

Next, the defendants argue that paragraphs 3, 5, 6, 11, 12, and 13 of Officer Ronald Jennings's affidavit (Doc. 58-19) are identical to paragraphs in James Lyons's affidavit (Doc. 58-18) and should thus be stricken. (Doc. 65, p. 7, ¶ 1). Because the Court overruled the defendants' objections to James Lyons's affidavit, the Court overrules the defendants' objections to the same paragraphs in Officer Jennings's affidavit.

The defendants argue that the remaining statements in Officer Jennings's affidavit are irrelevant and inadmissible hearsay. (Doc. 65, pp. 7-8, ¶¶ 2-4). In his affidavit, Officer Jennings states that he heard Sgt. John Callahan ask for Mr. Minnifield's location and thereafter swapped positions with Mr. Minnifield. (Doc. 58-19, p. 1, ¶ 4). Officer Jennings states that he heard Deputy Chief Moody Duff tell Mr. Minnifield that no movement would take place on the motorscout position because of Mr. Minnifield's grievances. (Doc. 58-19, p. 2, ¶ 7). Officer Jennings states that he heard Lt. James Blanton say that he would control the amount of

grievances filed. (Doc. 58-19, p. 2, ¶ 10). Mr. Minnifield may avoid a hearsay objection at trial by calling Ronald Jennings, Deputy Chief Duff, or Lt. Blanton as witnesses. Moreover, the statements made by the supervisors may be admissible at trial as an opposing party's statements or on cross-examination as prior statements. *See* Fed. R. Evid. 801(d). The statements are relevant to Mr. Minnifield's standing in the Tactical Unit and his supervisors' knowledge of his grievances. Therefore, the Court overrules the defendants' objections to the affidavit of Ronald Jennings.

4.      The Affidavits of Kimball Karmondi and Timothy Edwards (Doc. 58-20; Doc. 58-21)

Finally, the defendants object to the affidavits of Officers Kimball Karmondi (Doc. 58-20) and Timothy Edwards (Doc. 58-21) on the grounds that the affidavits are inadmissible hearsay and irrelevant. (Doc. 65, pp. 8-10). The statements in both affidavits are either identical to or describe the same events as the other affidavits. Because the Court overruled the defendants' objections to the other affidavits, the Court overrules the defendants' objections to the affidavits of Kimball Karmondi and Timothy Edwards.

Based on the foregoing reasons, the Court denies the defendants' motion to strike.

**B.      The Defendants' Timeliness Arguments**

The defendants argue that the Court should enter judgment in their favor on Mr. Minnifield's Title VII claims related to the 2015 TSA K-9 position against the

City because Mr. Minnifield did not timely bring those claims. (Doc. 43, pp. 21-22). Before bringing suit under Title VII, a plaintiff must file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Mr. Minnifield filed a charge of discrimination with the EEOC within 180 days after the City denied him a 2013 patrol K-9 position. (Doc. 15-1, p. 2). He did not file a charge with the EEOC following any other alleged discriminatory practice.

Mr. Minnifield's Title VII claim for race discrimination against the City rests on Mr. Minnifield's allegations that the City failed to promote him to a patrol K-9 position in 2013, promoted three unqualified white officers to patrol K-9 positions, and disciplined him for conduct that white officers engaged in without consequences. (Doc. 15, p. 8). Mr. Minnifield did not assert in his EEOC charge that the City improperly disciplined him. Therefore, the Court will not consider Mr. Minnifield's Title VII claim concerning disparate discipline. The remainder of Mr. Minnifield's Title VII disparate treatment claim against the City is timely.[8]

So are Mr. Minnifield's § 1983 claims against the City and Sgt. Boackle. In Count V, Mr. Minnifield brings a § 1983 claim against the City and Sgt. Boackle

---

[8] To the extent that Mr. Minnifield attempts to assert a Title VII race discrimination claim against the City concerning the 2015 TSA K-9 position, his claim is untimely.

in his individual capacity. (Doc. 15, p. 11, ¶ 70).[9] In Count II, Mr. Minnifield asserts a § 1981 disparate treatment claim against the City and Sgt. Boackle. (Doc. 15, p. 12, ¶ 72). "Section 1981 does not provide a cause of action against state actors; instead, claims against state actors or allegations of § 1981 violations must be brought pursuant to § 1983." *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008) (citing *Butts v. Cty. Of Volusia*, 222 F.3d 891, 892-94 (11th Cir. 2000)). Therefore, the Court construes Count II and Count V of Mr. Minnifield's amended complaint as § 1983 claims for disparate treatment in violation of § 1981 against the City and Sgt. Boackle in his individual capacity.

The four-year "catch-all" statute of limitations in 28 U.S.C. § 1658 applies to a § 1981 disparate treatment claim brought pursuant to § 1983. *See Baker*, 531 F.3d at 1338-39. Each discrete act of disparate treatment alleged in this case occurred within four years before Mr. Minnifield filed this lawsuit. Therefore, Mr. Minnifield's § 1983 claims for disparate treatment in violation of § 1981 are timely.

Mr. Minnifield's Title VII retaliation claim against the City is not timely to the extent the claim is based on events following the failure to promote Mr.

___

[9] Mr. Minnifield brings a § 1983 claim against Sgt. Boackle in his official capacity as well, but Mr. Minnifield "agrees the claim against [Sgt.] Boackle in his official capacity is basically a claim against the City. However, the claim against [Sgt.] Boackle individually is due to remain." (Doc. 56, p. 48). A § 1983 claim brought against a city officer in his official capacity is redundant when the city also is named as a defendant. *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991). Accordingly, the Court will enter judgment in favor of Sgt. Boackle on Mr. Minnifield's § 1983 claims against Sgt. Boackle in his official capacity.

Minnifield to a 2013 patrol K-9 position because Mr. Minnifield did not amend or file a new charge with the EEOC after 2013. (Doc. 15, pp. 9-10).

In Count III of his amended complaint, Mr. Minnifield brings a § 1981 retaliation claim against the City based on the same facts as his Title VII retaliation claim. (Doc. 15, pp. 9-10). Like Mr. Minnifield's § 1981 disparate treatment claim, the Court construes Mr. Minnifield's § 1981 retaliation claim as a claim brought pursuant to § 1983 against the City and Sgt. Boackle in his individual capacity. A four-year statute of limitations applies to a § 1981 retaliation claim brought pursuant to § 1983. *See Baker*, 531 F.3d at 1338-39. Each discrete act of retaliation that Mr. Minnifield alleges in this case occurred within four years before Mr. Minnifield filed this lawsuit. Therefore, Mr. Minnifield's § 1983 claims for retaliation in violation of § 1981 are timely.

In Count IV of his amended complaint, Mr. Minnifield alleges that the City created a hostile work environment in violation of Title VII when the City denied him a TSA K-9 position, failed to post the TSA K-9 position, reposted the patrol K-9 position, unlawfully disciplined him after his complaints, chose not to send K-9 officers to calls in which he was involved, and covered up records in efforts to defend against Mr. Minnifield's claims. (Doc. 10, p. 10, ¶ 66). Although these events allegedly occurred after Mr. Minnifield filed his 2013 EEOC charge, the City's failure to promote Mr. Minnifield to a patrol K-9 position as alleged in his

2013 EEOC charge forms part of the alleged hostile work environment. (Doc. 15, p. 10, ¶ 66; Doc. 15-1, pp. 3-4). For a Title VII hostile work environment claim to be timely, "the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). Therefore, Mr. Minnifield's Title VII hostile work environment claim is timely.

### C.   <u>Punitive Damages</u>

The defendants ask the Court to eliminate Mr. Minnifield's claims for punitive damages against the City. (Doc. 15, p. 14, ¶ 1; Doc. 43, pp. 52-53). Mr. Minnifield concedes the point. (Doc. 56, p. 52); *see also* Ala. Code § 6-11-26 (1975) ("Punitive damages may not be awarded against the State of Alabama or any county or municipality thereof . . . ."). Therefore, the Court strikes from Mr. Minnifield's amended complaint his demand for punitive damages from the City.

The defendants have not asked the Court to strike Mr. Minnifield's demand for punitive damages as it pertains to his § 1983 claims against Sgt. Boackle in Sgt. Boackle's individual capacity. A jury may assess punitive damages in a § 1983 action when the plaintiff proves that the defendant's conduct was "motivated by evil motive or intent, or when [the defendant's conduct] involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 51 (1983). Accordingly, the Court's order with respect to punitive

damages applies only to Mr. Minnifield's demand against the City.

### D. Title VII Disparate Treatment Claim Against the City

The City asks the Court to enter judgment in its favor on Mr. Minnifield's disparate treatment claims against it. When, as here, there is no direct or statistical evidence of discrimination, a plaintiff may identify circumstantial evidence to overcome summary judgment. A plaintiff may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) to establish a disparate treatment claim. Under *McDonnell Douglas*, a plaintiff first must establish a prima facie case by presenting evidence that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside of his protected class. *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). "The successful assertion of a prima facie case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted).

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the

challenged action.  *Rioux*, 520 F.3d at 1275.  The employer's burden is very light. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005).

If the employer satisfies its burden, then the burden shifts back to the plaintiff to prove that the employer's "proffered reason really is a pretext for unlawful discrimination."  *Rioux*, 520 F.3d at 1275 (internal quotation marks and citations omitted).  "A plaintiff can do so directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)).

As the Eleventh Circuit has explained, the *McDonnell Douglas* framework is not "the only way to use circumstantial evidence to survive a motion for summary judgment."  *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012).  "If a plaintiff 'presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent,' she 'will always survive summary judgment.'"  *Id*. (quoting *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that discriminatory intent motivated an

employment decision.  *Lockheed-Martin Corp.*, 644 F.3d at 1328.

        1.    <u>Mr. Minnifield's Prima Facie Case</u>

As an African-American, Mr. Minnifield is a member of a protected class.  *See* 42 U.S.C. 2000e-2(a).  The City challenges Mr. Minnifield's ability to establish the other three elements of his prima facie case.

Because Mr. Minnifield is asserting a discrimination claim based on a failure to promote, he must establish that he applied for and was qualified for the position at issue.  *See Kidd v. Mando American Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2013) (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)).  The parties do not dispute that Mr. Minnifield applied for a patrol K-9 position in 2013.  (Doc. 57-1, p. 156; Doc. 57-19, p. 2; Doc. 58-5, pp. 152, 158; Doc. 59-20).

The parties offer different descriptions of the qualifications for the patrol K-9 position.  Mr. Minnifield argues that pursuant to R&R 117-33, the 2012 vacancy announcement, and the two 2013 vacancy announcements, an eligible candidate for the K-9 unit had to pass the Tactical Unit's minimum standards, which included a physical assessment, and a Birmingham SWAT school.  (Doc. 56, p. 35; *see* Doc. 57-2, p. 1; Doc. 57-3, p. 1; Doc. 57-9, p. 1; Doc. 57-10, p. 1).  The defendants disagree and argue that pursuant to R&R 117-42 and Sgt. Boackle's and Chief Roper's testimony, an eligible candidate had to voluntarily train with the

K-9 unit.  (Doc. 43, p. 5, ¶¶ 14-15, p. 8, ¶ 25; *see* Doc. 50, p. 23; Doc. 58-5, pp. 219-21, 242-46; Doc. 59-23, pp. 134-35).

Either way, viewed in the light most favorable to Mr. Minnifield, the evidence indicates that he was qualified for the K-9 Unit.  In fact, under Mr. Minnifield's version of the qualifications, he was the only qualified applicant. (*See* Doc. 58-11; Doc. 59-14).  Under the defendants' version, Mr. Minnifield was at least minimally qualified because he voluntarily trained with the K-9 Unit on at least two occasions.  (*See* Doc. 58-5, p. 112).  The defendants have not demonstrated that an eligible candidate had to voluntarily train for more hours than Mr. Minnifield trained.  Moreover, Sgt. Boackle represented that Mr. Minnifield was qualified for the K-9 unit in 2011.  (Doc. 58-24, pp. 1-2).  Accordingly, the City has not established as a matter of law that Mr. Minnifield was not qualified to be a K-9 handler.

The City also has not established as a matter of law that Mr. Minnifield did not suffer an adverse employment action.   "'An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'"  *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Gupta v.*

*Florida. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)) (internal quotation marks omitted). The employment action "must be materially adverse as viewed by a reasonable person in the circumstances." *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016) (internal quotation marks omitted). "Evidence of 'direct economic consequences' is not always required" to establish an adverse employment action. *Grimsley v. Marshalls of MA, Inc.*, 284 Fed. Appx. 604, 608 (11th Cir. 2008) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)).

The City's failure to promote Mr. Minnifield to the K-9 unit had an adverse effect on Mr. Minnifield's status as an employee and deprived Mr. Minnifield of employment opportunities. Sgt. Boackle stated that the duties of a K-9 handler differ substantially from those of a motorscout. (*See* Doc. 57-22, p. 1; Doc. 58-5, pp. 126, 143). A K-9 handler works with a dog that apprehends and bites suspects or searches for explosives. (Doc. 58-5, p. 126). A motorscout rides a motorcycle and performs patrol duties for funeral processions, parades, traffic accidents, and other activities. (Doc. 57-1, p. 19; Doc. 58-5, p. 252).

A K-9 handler position seems to be exclusive, prestigious, and competitive. In a memo sent to Chief Roper in 2013, Sgt. Boackle stated that because the K-9 unit had only four K-9 handlers, he could assign only one K-9 handler to each

precinct.  (Doc. 57-22, p. 1).[10]  Sgt. Boackle stated that the K-9 unit "[i]ntels building/residence searches, [tracks] fleeing felons," and "is used to assist Patrol and Detective Bureau with high crime areas in hopes to detour or apprehend part 1 offenders."  (Doc. 57-22, p. 1).  Sgt. Boackle testified that handling a K-9 is "the most liab[le] thing a police department especially here in Birmingham, Alabama has to offer."  (Doc. 58-5, p. 129).

The City argues that failing to promote Mr. Minnifield was not adverse because the patrol K-9 position did not come with a 5% increase in pay.  (Doc. 66, p. 17; *see* Doc. 57-1, pp. 60-61).  Be that as it may, the City denied Mr. Minnifield the opportunity to work in an exclusive position that rarely posted vacancies.  (*See* Doc. 58-5, pp. 206-07; Doc. 48, p. 107).  Viewing the evidence in the light most favorable to Mr. Minnifield, the K-9 position was a coveted promotion in all respects except for salary.  Mr. Minnifield has presented disputed evidence from which jurors could determine that he suffered an adverse employment action when the City failed to promote him to a K-9 position.

Finally, to establish his prima facie case of racial discrimination, Mr. Minnifield must show that the City treated him less favorably than similarly-

---

[10] Apparently one of the four K-9 handlers was African-American.  Sgt. Boackle testified that Terrence McKee, an African-American officer, became a K-9 handler before Sgt. Boackle came to the K-9 Unit and that Officer McKee was still in the K-9 Unit as of 2015.  (Doc. 58-5, pp. 83, 228-29).  Sgt. Boackle also testified that Gregory Porter, an African-American officer, worked as a K-9 handler, but Sgt. Boackle did not know when Officer Porter arrived at or left the K-9 Unit.  (Doc. 58-5, pp. 82-83).

situated non-minority employees. In the context of his failure to promote claim, Mr. Minnifield may satisfy this burden by showing "that other equally or less qualified employees who were not members of the protected class were promoted." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997).

The City promoted three white officers to the K-9 unit in 2013, none of whom passed the Tactical Unit's minimum standards. (Doc. 58-5, pp. 193-94, 245). Viewing the evidence in the light most favorable to Mr. Minnifiled, those Caucasian officers were not qualified to handle dogs because they could not pass the necessary physical, and they did not attend SWAT school. The City disputes Mr. Minnifield's characterization of the qualifications for a K-9 handler; a jury must resolve the dispute.

Therefore, Mr. Minnifield has established a prima facie claim against the City for discriminatory failure to promote in 2013.

### 2. The City's Proffered Legitimate Non-Discriminatory Reason

The defendants contend that Sgt. Boackle did not recommend Mr. Minnifield for one of the 2013 patrol K-9 positions because Mr. Minnifield rejected an offer for a dual purpose K-9 that would have been trained to apprehend and bite suspects. (Doc. 43, p. 10, ¶ 36, pp. 36-37; s*ee* Doc. 50, pp. 4-5). In addition, Sgt. Boackle explained that he recommended the three white officers over Mr. Minnfield because Mr. Minnifield was not qualified for the position, and the

other officers voluntarily trained with the K-9 Unit more than Mr. Minnifield. (Doc. 50, pp. 4-5; *see* Doc. 43, p. 43). Finally, Sgt. Boackle points out that he preferred Laquinte Louis and Dennis Gibson, two African-American officers, for the patrol K-9 position, so that race was not a factor in his evaluations. (Doc. 58-5, pp. 247-48). The City may rely on this evidence to satisfy its exceedingly low burden.

### 3. Mr. Minnifield's Evidence of Pretext

Mr. Minnifield argues that the City's proffered reasons for selecting the three white officers are pretext for the City's actual discriminatory intent. (Doc. 56, p. 38). Mr. Minnifield contends that the offer for the dual purpose K-9 was illusory, that the three white officers selected for the Patrol K-9 position were not qualified, and that voluntarily training with the dogs was not a requirement for the K-9 unit. (Doc. 56, pp. 38-41). Moreover, Mr. Minnifield argues that Sgt. Boackle did not offer the patrol K-9 position to an African-American officer. (Doc. 56, p. 41).

Mr. Minnifield has presented evidence that indicates that the offer for the dual purpose K-9 was not as the defendants portray it. Sgt. Boackle admitted that the City did not have a dog trained in both apprehension and explosives detection. (Doc. 58-5, p. 120). Sgt. Boackle only "assumed" that the authority had been obtained to train a dual purpose dog, and he had refused to have dogs trained for

both patrol and explosives detection on his watch because of liability concerns. (Doc. 58-5, pp. 131-32). With respect to the fictitious dual purpose dog, although Mr. Minnifield may have stated with respect to that dog in January 2012 that he did not want a biting dog, he ultimately indicated that he wanted a patrol dog, i.e. a biting dog, by applying for one in September 2012. Accordingly, Mr. Minnifield has established a genuine issue of material fact concerning pretext.

Next, although the three white officers who received patrol K-9 positions in 2012 may have had more dog training than Mr. Minnifield, Mr. Minnifield has presented evidence which indicates that an eligible candidate had to pass the Tactical Unit's minimum standards, and none of the white officers did. The 2012 vacancy announcement states that an eligible candidate must be assigned to the Tactical Unit. (Doc. 57-2, p. 1). Both 2013 vacancy announcements state that the patrol K-9 position is within the Tactical Unit. (Doc. 57-9, p. 1; Doc. 57-10, p. 1). Under a section labelled "Special Requirements for Tactical Applications," both 2013 announcements list for the available K-9 positions required completion of "the Tactical Unit's physical assessment" and "Basic SWAT School." (Doc. 57-9, p. 1; Doc. 57-10, p. 1). R&R 117-33 states that "Patrol K-9 Teams" are within the Tactical Unit, and, under the heading "Tactical Unit Selection," that officers "[m]ust pass physical test that has been approved by the Chief of Police." (Doc. 57-11, p. 1). This evidence raises a genuine issue of material fact regarding the

City's contention that Mr. Minnifield was not qualified for a Patrol K-9 position.[11] The evidence also suggests that the City's departure from its established hiring procedure created leeway for and favored Caucasian candidates over Mr. Minnifield. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext.").

The evidence, viewed the light most favorable to Mr. Minnifield demonstrates that the City offered him a non-existent "dual K-9" position, instructed him to attend non-existent training for that position, demanded that he have training for a patrol K-9 position that BPD's rules and regulations did not require, and refused to recognize him as qualified for the 2013 patrol K-9 position even though the City, in 2011, implicitly recognized that Mr. Minnifield was qualified to handle K-9s because the City offered Mr. Minnifield a dual K-9. The three Caucasian officers whom the City promoted to patrol K-9 positions in 2013 did not have the Tactical Unit training that BPD's rules and regulations required.

---

[11] On the other hand, R&R 117-42 establishes the operating rules for "Canine Operations." (Doc. 50, p. 14). R&R 117-42 states that "[o]nly officers who volunteer for the K-9 Unit will be considered for the unit." (Doc. 50, p. 23, ¶ VI.C). Sgt. Boackle and Chief Roper testified that even though the K-9 Unit follows R&R 117-33, R&R 117-42 governs the operations and selections of officers for the K-9 Unit. (Doc. 58-5, p. 273; Doc. 59-23, p. 135). Sgt. Boackle and Chief Roper testified that a K-9 handler does not need to pass the tactical standards. (Doc. 58-5, p. 245; Doc. 59-23, pp. 134-35, 139). Sgt. Boackle testified that he never saw the 2013 vacancy announcements. (Doc. 58-5, p. 182). This evidence regarding the qualifications for K-9 handlers clearly is disputed.

Accordingly, Mr. Minnifield has established "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendants' proffered legitimate reasons such that "a reasonable fact finder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (internal quotation marks omitted).[12] Therefore, the Court denies the defendants' motion for summary judgment on Mr. Minnifield's Title VII disparate treatment claim against the City based on the failure to promote him to a 2013 Patrol K-9 position.

**E.** **§ 1983 Claim for Disparate Treatment in Violation of § 1981 Against the City**

Neither a municipality nor its employees may incur liability under § 1983 for the acts of city employees under a theory of respondeat superior. *Monell v. Dep't of Social Serv's*, 436 U.S. 658, 691 (1978); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). For a municipality to be held liable under § 1983 for actions taken by a city employee, the employee's execution of a city policy or custom must inflict the injury, or the employee must have final policymaking authority with respect to the action taken. *McDowell*, 392 F.3d at 1289-91 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "[F]or a plaintiff to demonstrate a policy or custom, it is 'generally necessary to show a persistent and

---

[12] Mr. Minnifield has offered other circumstantial evidence of racial discrimination that he may attempt to introduce at trial, but the evidence that the Court has discussed here is sufficient to overcome the City's motion for summary judgment on Mr. Minnifield's Title VII race discrimination claim.

wide-spread practice.'" *McDowell*, 392 F.3d at 1290 (quoting *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999)).

Mr. Minnifield has not demonstrated that the City has a policy or custom of denying promotions to African-American officers. Sgt. Boackle recommended Dennis Gibson, who is African-American, for a K-9 handler position. (Doc. 50, pp. 2-3). At least one K-9 handler, Terrence McKee, is African-American. (Doc. 58-5, pp. 83, 229; Doc. 59-12, p. 123). At some time, Gregory Porter, who is African-American, worked as a K-9 handler. (Doc. 58-5, pp. 82-83). The officers in the chain of command for Sgt. Boackle's hiring recommendations -- Lt. Smith, Capt. Davis, Deputy Chief Duff, and Chief Roper -- all are African-American. (Doc. 58-5, pp. 249-51). Chief Roper testified that the City has a policy that prohibits racial discrimination and retaliation, that BPD regularly trains supervisors to respect the civil rights of officers, that Sgt. Boackle received this training, and that BPD officers exceed the required number of annual training hours. (Doc. 59-23, pp. 43-44, 60-63).

In addition, Sgt. Boackle did not have final policymaking authority. Mr. Minnifield concedes that Chief Roper is the final decision maker. (Doc. 56, p. 36). Mr. Minnifield argues that Chief Roper "is a cat's paw in this situation." (Doc. 56, p. 36). Mr. Minnifield contends that by relying on Sgt. Boackle's recommendations, Chief Roper "actively endorsed and approved Boackle's

conduct." (Doc. 56, p. 50). The Court has found no evidence to support this conclusory allegation.

In addition, no evidence supports Mr. Minnifield's allegations that the City "negligently supervises its hiring officials," "was actually aware of the preferential placement of white officers," "failed or refused to properly train or supervise its decisionmakers, and allowed a pervasive atmosphere of racial discrimination to exist within the police department." (Doc. 15, pp. 12-13, ¶¶ 74-76).

Because Mr. Minnifield has not established a basis for subjecting the City to § 1983 liability, the Court enters judgment for the City on Mr. Minnifield's § 1983 disparate treatment claim.

## F. Section 1983 Claim for Disparate Treatment in Violation of § 1981 Against Sgt. Boackle in his Individual Capacity

Section 1983 provides a cause of action against any person who, "acting under color of state law, committed acts that deprived [a plaintiff] of some right [or] privilege [] protected by the Constitution or laws of the United States." *Easley v. Dept. of Corrections*, 590 Fed. Appx. 860, 868 (11th Cir. 2014) (per curiam) (citing 42 U.S.C. § 1983). "Title VII and § 1983 claims have the same elements where the claims are based on the same set of facts, and in such cases, the claims are subject to the same legal analysis." *Quigg v. Thomas Cnty. School Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (citing *Rioux*, 520 F.3d at 1275 n.5).

### 1. Mr. Minnifield's 1983 case – 2013 Patrol K-9

Mr. Minnifield based his Title VII disparate treatment claim against the City on Sgt. Boackle's conduct. Mr. Minnifield established sufficient evidence to survive a motion for summary judgment on his Title VII disparate treatment claim. Because the analytical frameworks of Title VII and § 1983 disparate treatment claims are the same, the Court denies summary judgment on Mr. Minnifield's § 1983 disparate treatment claim against Sgt. Boackle in his individual capacity based on the failure to promote Mr. Minnifield to a 2013 Patrol K-9 position.

2. Mr. Minnifield's 1983 case – 2015 TSA K-9

Mr. Minnifield alleges that Sgt. Boackle discriminated against him when Sgt. Boackle removed the K-9 unit from the Tactical Unit in 2015, failed to post a vacancy announcement for the 2015 TSA K-9 position, and gave the 2015 TSA K-9 position to Larry McGhee, a white officer. (Doc. 15, p. 9, ¶ 59).

Mr. Minnifield did not suffer an adverse employment action when Sgt. Boackle selected Officer McGhee for the 2015 TSA K-9 position because Mr. Minnifield was not qualified for the position. Because of injuries he sustained in a motorcycle accident on January 3, 2014, as of 2015, Mr. Minnifield could perform only administrative functions as a desk officer; he could not work as a K-9 handler. (Doc. 57-1, pp. 20-21). Therefore, the Court enters judgment for Sgt. Boackle on Mr. Minnifield's § 1983 disparate treatment claim as it relates to the 2015 TSA K-9 position.

## G. Title VII Retaliation Claims Against the City

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]."  42 U.S.C. § 2000e-3(a).  The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims based on circumstantial evidence.  *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016) (citations omitted).  "To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).  Like discrimination claims under Title VII, the *McDonnell Douglas* framework is not the only way that a plaintiff may establish a retaliation claim.  A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that retaliatory intent motivated an employment decision.  *Lockheed-Martin Corp.*, 644 F.3d at 1328; *see also Calvert v. Doe*, 648 Fed. Appx. 925, 929 (11th. Cir. 2016) (applying the "convincing mosaic" standard to a Title VII retaliation claim).[13]

---

[13] *Calvert* is not binding authority, but the Court cites the decision for its persuasive value.  *See United States v. Rodrigues-Lopez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004) ("While unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive

"Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). "After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Id.*

### 1. Mr. Minnifield's prima facie case – 2013 Patrol K-9

Title VII protects employees who file a charge of discrimination with the EEOC or use their employer's internal grievance procedures. *Shannon v. Bellsouth Telecom., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

Mr. Minnifield filed a charge of discrimination with the EEOC on December 27, 2011. (Doc. 58-12, p. 1). Mr. Minnifield filed multiple internal grievances of racial discrimination before and after filing his first EEOC charge.[14] Therefore,

---

authority."); *see also* 11th Cir. Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[14] The record does not clearly indicate how many grievances Mr. Minnifield filed, and Mr. Minnifield did not provide copies of each grievance he allegedly filed. The defendants do not dispute that Mr. Minnifield filed any particular grievance. According to Fraternal Order of Police meeting notes, Mr. Minnifield filed at least four grievances before March 6, 2012. (Doc. 59-18, p. 3). In his January 26, 2012 grievance, Mr. Minnifield referred to three grievances. (Doc. 58-13, p. 1, 3). In his deposition, Mr. Minnifield referred to grievances filed on October 12, 2009 and August 11, 2011. (Doc. 57-1, pp. 13, 34).

Mr. Minnifield engaged in statutorily protected activity. As previously discussed, the City's failure to promote Mr. Minnifield was an adverse employment action.

"To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 213 F.3d at 590. "'Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action.'" *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)). A plaintiff must proffer evidence "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Southwestern Med. Center v. Nassar*, 570 U.S. 338, 352 (2013); *see also Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016).

Here, Mr. Minnifield has offered a mosaic of circumstantial evidence from which a jury could infer a causal connection between his protected activity and the City's failure to promote him. Sgt. Boackle testified that he did not know about Mr. Minnifield's grievances or EEOC charge before 2014. (Doc. 58-5, p. 61). But the defendants acknowledge that Sgt. Boackle attended a March 6, 2012 Fraternal Order of Police (FOP) meeting that Mr. Minnifield attended to answer questions

about Mr. Minnifield's requests for the FOP to pay the filing fees for four of his grievances. (Doc. 66, p. 7, ¶ 62; Doc. 59-18, pp. 1, 3). Sgt. Boackle attended a June 5, 2012 FOP meeting that Mr. Minnifield attended to discuss the lawyer fees incurred by Mr. Minnifield for his grievances. (Doc. 59-18, pp. 10, 13). This evidence, viewed in the light most favorable to Mr. Minnifield, creates a triable issue of fact concerning Sgt. Boackle's awareness in 2013 of Mr. Minnifield's complaints.

Moreover, in a deposition he gave on November 20, 2014 for Mr. Minnifield's 2014 lawsuit, Sgt. Boackle was asked if Mr. Minnifield remained qualified for a TSA K-9 position after Sgt. Boackle selected Larry Phillips for the 2011 TSA K-9 position. (Doc. 58-7, p. 70). Sgt. Boackle responded, "he so quickly filed complaints because he wasn't chosen and even after I was ordered to have a dog given to him and he refused it, at that point I didn't feel he would be an asset to my unit." (Doc. 58-7, p. 70). Accordingly, a genuine issue of material fact exists as to whether Mr. Minnifield's complaints and the City's failure to promote him to a 2013 Patrol K-9 position are related. Therefore, the City has not established that it is entitled to summary judgment based on Mr. Minnifield's alleged failure to establish a prima facie case of retaliation.

> 2. The City's Proffered Legitimate Non-Discriminatory Reason and Pretext

As previously discussed in the context of Mr. Minnifield's Title VII

disparate treatment claim, the City satisfied its light burden of offering a legitimate non-retaliatory reason for failing to promote Mr. Minnifield to a 2013 patrol K-9 position. Mr. Minnifield raised a genuine issue of material fact as to whether the City's proffered reasons are pretext. *See* pp. 28-32, above. Therefore, the Court denies the defendants' motion for summary judgment on Mr. Minnifield's Title VII retaliation claim against the City based on the failure to promote him to a 2013 patrol K-9 position.

Given the "but for" standard for retaliation claims, at trial, Mr.Minnifield will not be able to establish liability under both his Title VII racial discrimination claim against the City and his Title VII retaliation claim against the City.

### H. <u>Section 1983 Claim for Retaliation in Violation of § 1981 Against the City</u>

To subject the City to § 1983 liability, Mr. Minnifield must demonstrate that Sgt. Boackle executed a municipal policy of retaliating against employees for filing grievances or that Sgt. Boackle had final policymaking authority. *See McDowell*, 392 F.3d at 1289-91.

To support his argument that the City implemented a policy of retaliating against employees, Mr. Minnifield cites to Sgt. Boackle's deposition given in Mr. Minnifield's prior lawsuit, the affidavit of Officer Ronald Jennings, and the affidavit of Officer James Lyons. (Doc. 56, pp. 37, 47). Sgt. Boackle testified, "[Mr. Minnifield] so quickly filed complaints because he wasn't chosen and even

after I was ordered to have a dog given to him and he refused it, at that point I didn't feel he would be an asset to my unit." (Doc. 58-7, p. 71). Officer Jennings stated that at a meeting on January 18, 2012, he heard Deputy Chief Duff tell Mr. Minnifield that "because you all filed a Grievance and EEOC complaint, that no movement would take place on the Motorscout position." (Doc. 58-19, p. 2). Officer Lyons stated that he heard officers inform Mr. Minnifield that he "would never be assigned to the K-9 Unit" and heard Lt. James Blanton say "[t]his new administration ain't scared of no Grievances or EEOC complaint and believe me they are going to deal with anyone who breaks the Chain of Command." (Doc. 58-18, p. 3, ¶ 12).

None of the evidence raises a triable issue of fact concerning a City policy of retaliation. Viewed in the light most favorable to Mr. Minnifield, Sgt. Boackle's testimony indicates his personal motivation for not recommending Mr. Minnifield. Mr. Minnifield did not explain how the "no movement would take place on the Motorscourt position" statement implicates a City policy. As previously discussed, Sgt. Boackle did not have final policymaking authority. Sgt. Boackle's alleged retaliation did not affect Chief Roper's selections, and Chief Roper did not condone retaliation by selecting three officers from the list of recommended officers.

Because Mr. Minnifield has not established a basis for holding the City

liable under § 1983, the Court enters judgment for the City on Mr. Minnifield's § 1983 retaliation claim.

## I.    Section 1983 Claim for Retaliation in Violation of § 1981 Against Sgt. Boackle in his Individual Capacity

A § 1983 retaliation claim has the same elements as a Title VII retaliation claim where the claim is based on the same set of facts.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  Mr. Minnifield's § 1983 retaliation claim against Sgt. Boackle rests on the same factual allegations as Mr. Minnifield's Title VII retaliation claim.  Because the Court denied summary judgment on Mr. Minnifield's Title VII retaliation claim, the Court also denies the motion for summary judgment on Mr. Minnifield's § 1983 retaliation claim against Sgt. Boackle in his individual capacity.

## J.    Hostile Work Environment Claim Against the City

To establish a hostile work environment claim under Title VII, Mr. Minnifield "must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To state a prima facie case of hostile work environment, Mr. Minnifield must show that: "(1) [he] belonged to a protected group, (2) [he] was subjected to unwelcome harassment, (3) the

harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of [his] employment and create an abusive working environment, and (5) a basis exists for holding the employer liable." *Trask*, 822 F.3d at 1195.

According to Mr. Minnifield, "the entire department and all of his supervisors" talked about Mr. Minnifield's inability to obtain a K-9 position; because of Mr. Minnifield's complaints, Sgt. Boackle created "new hurdles to ensure [Mr.] Minnifield did not obtain his requested TSA K-9 position;" Sgt. Boackle refused to require his unit to assist on calls in which Mr. Minnifield was involved; and superior officers singled out Mr. Minnifield in roll call on multiple occasions. (Doc. 56, pp. 55-56).

Mr. Minnifield has not presented evidence of the entire department talking about his inability to obtain a K-9 position. Mr. Minnifield has not explained how he was removed from the entry team and called out in roll call. Therefore, no genuine issue of material fact exists as to the severity and pervasiveness of the alleged hostile work environment. The Court enters judgment for the City on Mr. Minnifield's Title VII hostile work environment claim.

## IV. CONCLUSION

For the reasons discussed above, the Court **DENIES** the defendants' motion to strike. (Doc. 65).

Additionally, the Court **GRANTS IN PART** and **DENIES IN PART** the defendants' motion for summary judgment. (Doc. 41). The Court enters summary judgment on the following claims:

(1)    the Title VII disparate treatment claim against the City, but only to the extent the claim is based on the City's discipline of Mr. Minnifield for conduct that white officers engaged in without consequences;

(2)    the Title VII retaliation claim against the City, but only to the extent the claim is based on events following the failure to promote Mr. Minnifield to a 2013 Patrol K-9 position;

(3)    the Title VII hostile work environment claim against the City;

(4)    all § 1983 claims against the City;

(5)    the § 1983 claims for disparate treatment and retaliation in violation of § 1981 against Sgt. Boackle in his individual capacity, but only to the extent the claims are based on events following the failure to promote Mr. Minnifield to a 2013 Patrol K-9 position; and

(6)    all § 1983 claims against Sgt. Boackle in his official capacity.

Those claims are **DISMISSED WITH PREJUDICE**.

The Court denies the motion for summary judgment with respect to the following claims:

(1)    the Title VII disparate treatment claim against the City, to the extent the claim is based on the failure to promote Mr. Minnifield to a 2013 Patrol K-9 position;

(2)    the Title VII retaliation claim against the City, to the extent the claim is based on the failure to promote Mr. Minnifield to a 2013 Patrol K-9 position; and

(3)    the § 1983 claims for disparate treatment and retaliation in violation

of § 1981 against Sgt. Boackle in his individual capacity, to the extent the claims are based on the failure to promote Mr. Minnifield to a 2013 Patrol K-9 position.

The Court strikes Mr. Minnifield's demand for punitive damages from the City.

**DONE** and **ORDERED** this March 30, 2018.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE