# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MONTAGUE MINNIFIELD** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-cv-00196-MHH** |
| | } | |
| **CITY OF BIRMINGHAM,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Montague Minnifield, a former officer in the Birmingham Police Department, presented his Title VII claims for race discrimination and retaliation against the City of Birmingham to a jury.  As discussed in several opinions in this case, Mr. Minnifield's claims concern the City of Birmingham's decision to decline his application for a K-9 patrol position.  (Docs. 70, 112).  The jury returned a unanimous verdict for Mr. Minnifield on his retaliation claim but did not reach a unanimous decision on his race discrimination claim.  (Doc. 161).  After trial, the Court granted Mr. Minnifield's motion to sever his race discrimination claim from his retaliation claim.  (Docs. 181, 186).  Consistent with the jury's verdict on Mr. Minnifield's retaliation claim, the Court entered a final judgment in favor of Mr. Minnifield and against the City for $562,220.00, (Doc. 187), and the Court

eventually granted Mr. Minnifield's motion to dismiss his race discrimination claim.[1]

The City has filed a motion to vacate the final judgment and order a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, or, alternatively, to amend the judgment pursuant to Rule 59(e). (Doc. 200). This opinion resolves the City's motions.[2] The opinion begins with a summary of the standard that governs Rule 59 motions. Then, the Court summarizes the relevant portions of the trial record. Finally, the Court evaluates the City's arguments under the law that governs Mr. Minnifield's retaliation claim.

## I.

Under Rule 59 of the Federal Rules of Civil Procedure, a court may order a new trial when "the verdict is against the weight of the evidence, [] the damages are excessive, or [] the trial was not fair to the party moving," or when "substantial errors in admission or rejection of evidence or instructions to the jury" warrant a new trial. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940) (brackets added). "A judge should grant a motion for a new trial when 'the verdict is against the clear

---

[1] The Court directed the Clerk of Court to assign a new civil action number to Mr. Minnifield's severed discrimination claim. Mr. Minnifield's severed race discrimination became case number 2:24-cv-00963-MHH (*Minnifield II*). The Court granted Mr. Minnifield's motion to dismiss *Minnifield II* pursuant to Federal Rule of Civil Procedure 41(a)(2). *Minnifield v. City of Birmingham*, No. 24-cv-963-MHH (N.D. Ala. July 18, 2024) (Docs. 5, 8).

[2] Mr. Minnifield has filed a motion to amend the Court's final judgment and has requested an award of attorneys' fees. (Docs. 188, 192, 194). The Court will address that motion separately.

weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Lipphardt v. Durango Steakhouse of Brandon*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)). "Because it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence.'" *Lipphardt*, 267 F.3d at 1186 (quoting *Hewitt*, 732 F.2d at 1556)). A court should not disturb a jury's verdict unless "the facts and inferences point overwhelmingly in favor of one party such that reasonable people could not arrive at a contrary verdict." *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1332 (11th Cir. 2016).

Under Rule 59(e), a party may ask a court to "alter or amend a judgment." FED. R. CIV. P. 59(e). "A Rule 59(e) motion cannot be used to relitigate old matters" or "raise arguments or present evidence that could have been raised prior to the entry of judgment." *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1287 (11th Cir. 2021) (alterations adopted) (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)). The "only grounds for granting a Rule 59[(e)] motion are newly discovered evidence or manifest errors of law or fact." *Town of Palm Beach*, 988 F.3d at 1287 (alteration adopted) (brackets added)

(quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)).  A district court's damages determinations are "the kind of reconsideration of matters encompassed within the merits of a judgment to which a Rule 59(e) motion was intended to apply." *See Alhassid v. Bank of America*, 688 Fed. Appx. 753, 761 (11th Cir. 2017) (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175–78 n.3 (1989)).

## II.

### Pretrial Proceedings

This case has a lengthy history.  Mr. Minnifield, a motorscout for the Birmingham Police Department, sued the City of Birmingham and Sergeant Heath Boackle after he applied unsuccessfully for a K-9 patrol position in the BPD.  (Doc. 1).  The Court denied Sergeant Boackle's motion for summary judgment based on qualified immunity, (Doc. 70), and Sergeant Boackle appealed, (Doc. 87).  On appeal, in analyzing Sergeant Boackle's qualified immunity defense, the Eleventh Circuit assumed that Mr. Minnifield's salary would not have changed had he been awarded a K-9 patrol position.  *Minnifield v. City of Birmingham Dep't of Police*, 791 Fed. Appx. 86, 91 (11th Cir. 2019) ("Our analysis therefore proceeds under the assumption that Officer Minnifield was denied a recommendation for a position that received the same pay as his motorscout position.").  The Eleventh Circuit found that the denial of the K-9 position resulted only in a loss of prestige.  *Minnifield*, 791

Fed. Appx. at 92–93.[3]   The Eleventh Circuit did not evaluate the availability of overtime wages for K-9 officers, (*see* Doc. 178, pp. 29–35); overtime pay is the focus of the City's post-trial motions.[4]

On remand, the City renewed its motion for summary judgment.  (Doc. 108). The Court denied the City's renewed motion for summary judgment with respect to Mr. Minnifield's race discrimination and retaliation claims and set those claims for trial.  (Doc. 118).[5]  To prepare for trial, the parties proposed jury instructions.  (*See* Docs. 134, 150, 221-1).  Mr. Minnifield proposed the following damages instruction:

> You should consider the following elements of damage, to the extent you find that Mr. Minnifield has proved them by a preponderance of the evidence, and no others:

---

[3] For reasons that are not material to this opinion, the Eleventh Circuit determined that Sergeant Boackle was entitled to qualified immunity.  *Minnifield*, 791 Fed. Appx. at 93.  Pursuant to the Eleventh Circuit's decision, the Court granted Sergeant Boackle's motion for summary judgment and dismissed him as a defendant in this action.  (Doc. 103).

[4] Because the Eleventh Circuit did not consider whether K-9 officers earn more overtime pay than motorscout officers, Mr. Minnifield may pursue this measure of damages without violating the law-of-the-case doctrine.  *See In re Lambrix*, 776 F.3d 789, 793 (11th Cir. 2015) (recognizing that where trial evidence differs substantially from evidence considered on appeal, the law-of-the-case doctrine does not prohibit consideration of the evidence in post-appeal proceedings in the trial court).  In addition, since the Eleventh Circuit decided Sgt. Boackle's appeal, the United States Supreme Court has held that denial of a lateral position may support a Title VII claim when the position the employee sought is considered more prestigious than the position the employee held. *Muldrow v. St. Louis*, 601 U.S. 346, 353, 359 (2024).  The *Muldrow* decision does not change the qualified immunity analysis with respect to Sgt. Boackle because the decision was not available when Mr. Minnifield applied for a K-9 officer position, but the decision is relevant to Mr. Minnifield's claims against the City of Birmingham.

[5] Initially, the Court granted the City's renewed motion based on the law-of-the-case doctrine. (Doc. 112).  Mr. Minnifield filed a motion to alter or amend the judgment, (Doc. 114), and the Court granted Mr. Minnifield's motion in a 38-page opinion, (Doc. 118).

>    (a)    net lost wages and benefits from the date of the denial of the
>           K-9 patrol position to the date of your verdict; and
>
>    (b)    emotional pain and mental anguish.
>
> To determine the amount of Mr. Minnifield's net lost wages and
> benefits, you should consider evidence of the actual wages he lost and
> the monetary value of any benefits he lost.

(Doc. 150, pp. 9–10).  The City proposed the following damages instruction:

> You should consider the following elements of damage, to the extent
> you find that Mr. Minnifield has proved them by a preponderance of
> the evidence, and no others:
>
> (a) net lost wages and benefits from the date of the denied lateral
>     transfer of the K-9 patrol position to the date of your verdict; and
>
> (b) emotional pain and mental anguish.
>
> To determine the amount of Mr. Minnifield's net lost wages and
> benefits, you should consider evidence of the actual wages he lost and
> the monetary value of any benefits he lost.

(Doc. 221-1, pp. 16–17).   In a footnote, the City asserted the following

regarding overtime wage evidence:

> The City of Birmingham has moved in limine to exclude evidence
> barred by the law of the case doctrine, namely, evidence inconsistent
> with the Eleventh Circuit's decision in *Minnifield v. City of
> Birmingham Dept. of Police*, 791 Fed. Appx. 86 (11th Cir. 2019).  The
> reference to "net lost wages and benefits" is included here because it is
> part of the pattern instructions, but this reference should be stricken
> because the Eleventh Circuit explicitly held that Plaintiff's alleged
> damages are for loss of alleged prestige, not pay.  [*Minnifield*, 791 Fed.
> Appx. at 86].

(Doc. 221-1, p. 17, n.12).

During the pretrial conference, Mr. Minnifield explained that to prove damages, he intended to produce evidence that K-9 patrol officers work a significant amount of overtime, which allows them to earn a significant amount of overtime pay. (Doc. 178, p. 29). The City argued that, based on this Court's rulings and the Eleventh Circuit's decision, the case was not "about lost wages or inability to get overtime." (Doc. 178, p. 11). The City asserted that the damages issue was whether there was "an adverse employment action due to a loss of prestige for Mr. Minnifield not receiving the K-9 patrol position that was first offered" to him in September 2012. (Doc. 178, p. 11). The City maintained that evidence of overtime pay was improper under the law-of-the-case doctrine. (Doc. 178, pp. 11, 29–34). The Court deferred ruling on the admissibility of overtime during the pretrial conference. (Doc. 178, pp. 35, 37–39).

During the pretrial conference, the Court also discussed with the parties the City's motion in limine to exclude evidence that Mr. Minnifield suffered a career-ending injury while on duty as a motorscout. (Doc. 178, pp. 35–37; *see also* Doc. 143, pp. 25–26). The City argued that the evidence should be excluded because the injury was too remote to be relevant to the issue of damages. (Doc. 178, pp. 35–37; *see also* Doc. 143, pp. 25–26). Mr. Minnifield argued that the evidence was admissible because had he received the K-9 patrol position, he "would not have been on the motorcycle" the day of his accident and, therefore, would not have been

7

injured.  (Doc. 178, p. 36).  The Court determined that evidence of the motorcycle injury was "not an appropriate consideration for the jury" with respect to damages because it was "too remote and too speculative," and the Court was not "convinced that it [was] an appropriate measure of damages even for emotional distress damages in a Title VII case."  (Doc. 178, pp. 45–46) (brackets added).

After the pretrial conference, the Court entered the following order regarding the admissibility of overtime wages:

> Consistent with the discussion during the November 16, 2023 pretrial conference in this matter, the Court has reviewed the record concerning the City's effort to exclude evidence of overtime wages that K-9 officers allegedly may earn.  The Court finds nothing in the record to preclude Mr. Minnifield from presenting that evidence at trial. Applying [] Rule 59,  the Court refused to consider Officer McKee's affidavit when Mr. Minnifield asked the Court to reconsider the summary judgment ruling in favor of the City because Mr. Minnifield did not satisfy the Rule 59 standard for supplementing the summary judgment record with new evidence.  (Doc. 118, p. 37).  The issue before the Court now concerns trial evidence, not belated summary judgment evidence.  Mr. Minnifield listed one of the witnesses who may offer testimony on this issue, Officer McKee, in his September 2023 witness list, so the City has adequate notice of the potential evidence. (Doc. 136, p. 2).  Nothing in the amended complaint, (Doc. 15), precludes the evidence.  At trial, Mr. Minnifield is not limited to the evidence in the summary judgment record.  *Tucker v. Housing Author. of Birmingham Dist.*, 507 F. Supp. 2d 1240, 1254–55 (N.D. Ala. 2006).  The law of the case doctrine does not preclude new evidence at trial following an appellate decision.  (Docs. 112, 118). Therefore, the Court will not, on a motion in limine, exclude evidence regarding available overtime opportunities for City of Birmingham K-9 officers.

(Doc. 151) (brackets added).

8

**Evidence Regarding Alleged Retaliation**

At trial, Mr. Minnifield established that he began working for the City of Birmingham Police Department in December 1997.  (Doc. 175, p. 199).  He retired from the City due to an on-the-job injury in July 2015.  (Doc. 175, p. 199).  In 2009, BPD's tactical unit posted five available positions:  four motorscout positions and one TSA K-9 position.  (Doc. 175, p. 204).  Mr. Minnifield applied to the unit.  (Doc. 175, pp. 204–05).  When Mr. Minnifield joined the tactical unit, he expressed to Sergeant Pruitt an interest in a K-9 position or a motorscout position.  (Doc. 175, pp. 204–05).[6]  Mr. Minnifield joined the unit as a freeway patrol officer; he received a motorscout position in 2012.  (Doc. 171, p. 72).[7]

In late 2011, Mr. Minnifield applied for a TSA K-9 position.  (Doc. 171, pp. 4, 72).  In December 2011, Mr. Minnifield learned that the City awarded the position to Officer Larry Phillips.  (Doc. 171, p. 10).  Officer Phillips is white; Mr. Minnifield is Black.  On December 27, 2011, Mr. Minnifield filed an EEOC charge in which he contended that the City discriminated against him based on his race when it awarded the TSA K-9 job to Mr. Phillips, a white man, because Mr. Minnifield was the most qualified for the position.  (Doc. 171, p. 12).

---

[6] When an employee joined to the tactical unit, the sergeant met with that officer to determine the officer's areas of interest.  (Doc. 170, pp. 92–93).

[7] Mr. Minnifield began working as a BPD motorscout between February 2021 and September 2012. (Doc. 171, p. 72).

On January 5, 2012, at his request, Mr. Minnifield met with Captain Henry Irby and Chief A.C. Roper. (Doc. 171, pp. 15–16). The following day, Mr. Minnifield met with Captain Richard Davis and Sergeant Heath Boackle. (Doc. 171, p. 16). During the second meeting, Mr. Minnifield was given two options for a K-9 position: he could train with Officer Phillips to prepare for a future TSA position that might never materialize, or he could accept a dual-purpose dog with a bomb distinction and a 5% pay increase but not actually work for the TSA. (Doc. 171, p. 16). Mr. Minnifield declined both options because, according to Mr. Minnifield, a new TSA position, that was contingent on an airport expansion, was not guaranteed, and the dual-purpose dog was fictitious. (Doc. 171, pp. 17–18).

Later that month, Mr. Minnifield met with Deputy Chief Duff, who told Mr. Minnifield that because he filed the EEOC charge, he would not be getting the TSA position. (Doc. 171, pp. 26–27). He also told Mr. Minnifield that Mr. Minnifield should have "sugar on his lips and love in his heart," that the Birmingham Police Department was not a democracy, and that Mr. Minnifield would not be getting what he wanted. (Doc. 171, p. 29). Several other officers in the chain of command above Mr. Minnifield also made comments to Mr. Minnifield in front of his coworkers about his complaints of discrimination. (Doc. 171, pp. 29–30). Mr. Minnifield testified that Deputy Chief Duff and Captain Irby were showing his grievances to other officers. (Doc. 171, pp. 14–17). Mr. Minnifield stated that Lieutenant Blanton

told the officers that the department's new administration was not afraid of anyone "filing any grievances and EEOC complaints" and that the department would "deal" with those who did. (Doc. 171, pp. 29–30). Lieutenant Blanton indicated that if he successfully put a stop to officers' grievances and EEOC charges, "he would be given [the rank of] captain." (Doc. 171, p. 30).

Because he did not receive the TSA K-9 position, on January 26, 2012, Mr. Minnifield filed a grievance with the City. (Doc. 171, p. 27). On July 31, 2012, Mr. Minnifield filed a federal lawsuit based on the purported discrimination and retaliation. (Doc. 171, p. 30).

In September 2012, Mr. Minnifield applied for a K-9 handler position, (Doc. 171, pp. 33–34), but the position remained open until February 2013, (Doc. 171, pp. 40–41). In February 2013, the department posted another position opening stating that it would begin taking applications for future openings, including solo motorscout, freeway patrol, mounted patrol, TSA K-9 handlers, and K-9 patrol handlers. (Doc. 171, pp. 43–44). In June or July 2013, Mr. Minnifield learned that three white officers received the K-9 patrol positions. (Doc. 171, pp. 47–48). Mr. Minnifield testified that he outranked the three officers. (Doc. 171, p. 48). As a result, in December 2013, Mr. Minnifield filed a new EEOC charge for discrimination and retaliation. (Doc. 171, p. 48; *see* Doc. 15-1). The K-9 handler

position for which Mr. Minnifield applied in September 2012 is the basis of Mr. Minnifield's retaliation claim.

## Damages Evidence

Mr. Minnifield testified that he made $58,000 annually as a motorscout. (Doc. 171, p. 54). Mr. Minnifield added that K-9 handlers, both TSA and K-9 patrol, received health insurance, on-call time, and other benefits that motorscouts did not receive. (Doc. 171, p. 54). Mr. Minnifield estimated that the difference in annual compensation for K-9 patrol positions and motorscouts was between $40,000 and $50,000. (Doc. 171, pp. 54–55). He testified that had he become a K-9 officer, he would have qualified for the "Drop" program through which he would have received approximately $100,000. (Doc. 171, p. 55). He also would have had access to other employment opportunities if he had become a certified K-9 handler. (Doc. 171, p. 55). Mr. Minnifield estimated that he had lost more than $1,000,000 by the time of trial because he did not receive the K-9 patrol position for which he applied in September 2012. (Doc. 171, pp. 55–56).

Onree Pruitt was the tactical unit supervisor during Mr. Minnifield's tenure with the unit. (Doc. 170, p. 91). Officer Pruitt became the Deputy Chief of Patrol in April 2023; he did not have that title when Mr. Minnifield applied for K9 positions in the BPD. (Doc. 170, p. 73). As the unit supervisor, Deputy Chief Pruitt calculated the overtime hours tactical unit officers accumulated. (Doc. 170, p. 119). Deputy

Chief Pruitt testified that K-9 handlers worked more overtime than other officers, (Doc. 171, p. 120), but he was not sure whether TSA K-9 officers accumulated more overtime than K-9 patrol handlers, (Doc. 170, p. 123).

Terrance McKee also testified at trial. Officer McKee worked as a TSA K-9 officer for 15 years; he became a motorscout in October 2023. (Doc. 175, pp. 111, 125–26). Officer McKee testified that he earned approximately $100,000 annually as a TSA K-9 officer; his pay did not exceed $100,000. (Doc. 175, p. 135). Officer McKee had been a motorscout for only two months at the time of trial, so he could not provide testimony about his annual salary as a motorscout or the difference in overtime between TSA K-9 officers and motorscout officers. (Doc. 175, pp. 135–36). He acknowledged that, as a TSA K-9 officer, he earned overtime pay by volunteering to work football games, marathons, and other events, (Doc. 175, p. 132), and motorscouts could earn overtime pay by responding to S.W.A.T. calls, escorting buses and funerals, and writing tickets. (Doc. 175, p. 128). He testified that TSA K-9 patrol positions had more opportunities for overtime than motorscouts. (Doc. 175, p. 134). Additionally, TSA K-9 officers and K-9 patrol officers had a week of on-call duty each month. (Doc. 175, pp. 38, 138). At the time of trial, Officer McKee had not been assigned a week of on-call duty as a motorscout, so he was not sure whether that was required of motorscouts. (Doc. 175, p. 138).

According to Metz Davis who worked as a K-9 patrol officer and then a TSA K-9 officer, all K-9 officers received overtime pay during on-call weeks. (Doc. 175, p. 38). K-9 patrol officers received two hours of overtime pay during on-call on weekdays. (Doc. 175, p. 38). On weekends, K-9 officers received three hours of overtime pay for on-call duty. (Doc. 175, p. 38). As a result, K-9 patrol officers earned between 10 and 12 hours of overtime every four to six weeks during their on-call week. (Doc. 175, p. 38–39, 42–44). K-9 patrol officers and TSA K-9 officers received overtime pay for hours that they reported to work during an on-call week. (Doc. 175, p. 44). The overtime pay rate was equivalent to the officer's regular hourly pay or straight time until the officer earned 80 hours during a pay period; then the overtime rate became time and one half of the officer's hourly rate. (Doc. 175, pp. 44–45). Officer Davis did not testify to his hourly wage, and he did not recall how much overtime pay he earned as a K-9 patrol or TSA K-9 officer. Officer Davis testified that his income did not exceed $75,000 until he became a TSA K-9 patrol officer. (Doc. 175, p. 73). As a TSA K-9 officer, he earned him closer to $100,000. (Doc. 175, p. 73).

The jury heard Orlando Wilson's deposition testimony. (Doc. 173, p. 5). Captain Wilson, captain of BPD's tactical unit, testified that he had access to K-9 officers' overtime records. (Doc. 200-1, pp. 17–18, tpp. 65–67). Captain Wilson

would not say that K-9 officers earned more than motorscout officers or the tactical unit as whole.  (Doc. 200-1, p. 18, tpp. 67–68).

The jury heard Justin Rossomme's deposition testimony.  Officer Rossomme testified that he had been a K-9 handler since the summer of 2013.  (Doc. 200-2, p. 9).  Before 2013, he was a patrol officer.  (Doc. 200-2, p. 11).  Officer Rossomme testified that his annual income increased when he became a K-9 officer.  (Doc. 200-2, pp. 28–29).  He did not receive a grade or step increase when he became a K-9 officer; his annual income increased because he worked more overtime.  (Doc. 200-2, pp. 29–30).  Officer Rossomme did not know how much more overtime he was working, but he testified that his personnel files would "given an exact amount" and contain his wage information.  (Doc. 200-2, p. 30).  Officer Rossomme's personnel files are not in evidence.

### Charge Conference, Jury Charges, and Deliberations

At the conclusion of the evidence, during the charge conference, the Court discussed with the parties the language of the damages charge.  The Court asked if the parties took issue with the language of the "net lost overtime wages and benefits" provision of the damages section.  (Doc. 172, pp. 9–10).  The discussion that followed focused on the date through which the lost overtime wages and benefits would be calculated.  Mr. Minnifield contended that the damages should be calculated "to the date of [the jury's] verdict" because "the defendant bears the

burden of proof of showing that . . . the damages would have been cut off at some point in time." (Doc. 172, pp. 9–10). According to Mr. Minnifield, based on the City's motion to exclude evidence of his career-ending injury, the City had not provided evidence of a time by which the damages should be cut off. (Doc. 172, pp. 9–10).[8] The City argued that the instructions should limit the period for damages through the date that Mr. Minnifield left the Birmingham Police Department – i.e., when he was injured and retired – because that was when Mr. Minnifield became disabled. (Doc. 172, p. 10). In response, the Court stated:

> It seems like the City's conundrum is that if it wanted to have an argument [that] damages should be cut off as of the date that Mr. Minnifield left the police department, the City would have to introduce evidence about the circumstances surrounding his departure and that would open the door to the plaintiff developing the evidence.
>
> [] [C]an the Court give the City the benefit both of disallowing the evidence that the City objected to and then also give the City the benefit of a damages cut off date because, without the evidence that the Eleventh Circuit has held that a defendant must bring forward to overcome the plaintiff's initial demonstration of damages, that would run through the trial.

(Doc. 172, pp. 15–16) (brackets added). Ultimately, the Court proposed that the jury instructions should state that the damages should be determined through the date of trial but provide "on the verdict form, in the special interrogatory regarding damages for lost income or benefits, . . . what that amount would be on a monthly basis."

---

[8] Counsel for Mr. Minnifield relied upon *Collins v. Koch Foods*, No. 20-13158, 2022 WL 1741775 (N.D. Ala. May 31, 2022), to support Mr. Minnifield's position. (Doc. 178, pp. 11).

(Doc. 172, pp. 17–18). The Court reasoned that it would allow for a simple resolution if this were ever the basis of an appeal. (Doc. 172, pp. 17–18). The City maintained its objection, but the parties otherwise agreed to the Court's proposal. (Doc. 172, pp. 18–19, 29–30).

Consistent with the discussions during the charge conference, the Court charged the jury on damages as follows:

> When considering the issue of compensatory damages, you should determine what amount, if any, has been proven by Mr. Minnifield by a preponderance of the evidence as full, just, and reasonable compensation for all of his damages that result from the City's decision to deny Mr. Minnifield a K-9 patrol officer position, no more and no less.
>
> Compensatory damages are not allowed as a punishment and must not be imposed or increased to penalize the City of Birmingham.
>
> Compensatory damages must not be based on speculation or guesswork.
>
> You should consider the following elements of damage, to the extent you find that Mr. Minnifield has proved them by a preponderance of the evidence, and no others:
>
> a) net lost overtime wages and benefits from the date of denial of the K-9 patrol position to the date of your verdict; and
>
> b) emotional pain and mental anguish.
>
> To determine the amount of Mr. Minnifield's net lost overtime wages and benefits, you should consider evidence of any actual wages he lost and any monetary value of any benefits he lost because he did not receive one of the K-9 patrol assignments that the Tactical Unit made in 2013.

17

(Doc. 172, pp. 56–57; *see also* Doc. 157-2, pp. 12–13).  The parties did not object to the instructions as charged.  (Doc. 172, pp. 133–34).

During deliberations, the jury asked three questions.  (Docs. 158, 159, 160).  First, the jury asked: "If the jury is unanimous on one of the causes of action under consideration but unable to reach unanimity on the other, can a verdict be rendered?"  (Doc. 158; *see also* Doc. 176, pp. 3–4).  After conferring with the attorneys, the Court instructed the jury generally to continue deliberating.  (Doc. 176, p. 5).  Three hours later, the jury reported:  "The jury has been able to reach consensus on one of the two claims put before us through the completion of compensation.  Unfortunately, we are unable to reach consensus on the second claim and see no resolution to this difference."  (Doc. 159; *see also* Doc. 176, p. 6).  The jury asked: "How do you want us to proceed?"  (Doc. 159; *see also* Doc. 176, p. 6).

After the jury's second question, Mr. Minnifield asked the Court to read to the jury an *Allen* charge, directing the charge to the one [claim] that is not unanimous."  (Doc. 177, p. 4) (brackets added).  The City moved for a mistrial.  (Doc. 177, pp. 4–7, 11).[9]  In analyzing the City's request for a mistrial, the Court stated:

---

[9] In doing so, the City restated its contention that Mr. Minnifield's overtime wages theory of damages was not advanced until trial.  (Doc. 177, p. 11).  The Court responded that "overtime wages didn't suddenly become an issue in the case late at the pretrial stage.  They'[d] been there.  They just weren't part of the discussion of adverse employment action at the summary judgment stage in this case."  (Doc. 177, pp. 12–13 (brackets added); *see* Doc. 110, p. 13 (citing Doc. 58-3, p. 26 and Doc. 59-13, p. 69)).

Under the Title VII discrimination claim, the court instructed the jurors that, for the purpose of Mr. Minnifield's race discrimination claim, an adverse employment action is a serious and material change in the terms, conditions, or privileges of employment. An employer's decision is materially adverse where it impacts the terms, conditions, or privileges of an employee's job in a real and demonstrable way.

This impact cannot be speculative and not everything that makes an employee unhappy is a materially adverse employment action. Rather, an employer's decision will constitute an adverse employment action where a reasonable person, in the circumstances, would find the employment action to be materially adverse.

In the context of the retaliation claim, the court instructed the jury, for a retaliation claim, the definition of adverse employment action differs from the meaning of the term in a race discrimination claim.

Mistreatment based on retaliation for protected conduct, for example, making or supporting a charge of discrimination.

For the purposes of Mr. Minnifield's retaliation claim, an adverse employment action is an action that would have made a reasonable employee reluctant to make or support a charge of discrimination. If a reasonable employee would be less likely to complain about or oppose alleged discrimination because he knew that the City would deny him a posted position for which he applied if he complained, then that action is an adverse employment action. If the employment action would not make it less likely for a reasonable employee to make complaints about or oppose alleged discrimination, then it is not an adverse employment action.

The court noted for the parties, in the draft instructions that the court circulated to the parties, that the language of the adverse employment action charge, that the court used and that the parties agreed to, came from the Eleventh Circuit's decision in [*Monaghan v. Worldplay, U.S., Inc.*, 955 F.3d 855, 861 (11th Cir. 2020)].

So if the jury follows the court's instructions, the jury will apply a different standard for adverse employment action to the discrimination claim and to the retaliation claim. The jury also will consider

19

discriminatory intent for the Title VII discrimination claim and retaliatory intent for the Title VII retaliation claim. The parties agreed to the verdict form that the court provided to the parties. The court explained to the parties that the plaintiff proposed separate verdict forms for the discrimination claim [] and for the retaliation claim -- but the court believed that, if the jury found on either claim or on both, that the damages for both claims were the same, meaning that the lost overtime wages and benefits that Mr. Minnifield is claiming are going to be the same amount for each claim and that the mental anguish damages would be the same because . . . [Mr. Minnifield] lost the opportunity to serve in the position that he had pursued, and the plaintiff's evidence says that that lost opportunity also prevented Mr. Minnifield from pursuing work that he had wanted to do after he retired from the police department. So the court believed that the mental anguish damages would be the same. And the parties agreed to that verdict form.

If there were to be a retrial of only the discrimination claim, the court would have an opportunity to address the damages issue, and there's different ways we could do that. We could have a jury just make findings of fact on the special interrogatory questions and determine whether or not there's liability, and then the court could simply impose damages based on this jury's finding of damages.

The court understands the City's arguments, but going back to the *Sowers* decision, *Sowers* really deals with situations in which a court says, Okay, I'm going to retry some of the issues in one claim.[10] And the Eleventh Circuit spoke in *Sowers* to whether the reexamination clause of the Seventh Amendment permits, in a particular case, the retrial of only certain issues. The Eleventh Circuit specifically cited a case where there was a claim and a counterclaim. The district court ordered retrial of all claims, and the Eleventh Circuit said that the district court should not have ordered a retrial of the counterclaim, only the initial claims.

Both the plaintiff's claim and the defendant's counterclaim were breach of contract claims, but the court said that they were independent claims and that only one of them needed to be retried, the plaintiff's claim.

---

[10] *Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112 (11th Cir. 2020).

So this case, I think, probably lands somewhere between *Sowers* and the decision that the Eleventh Circuit cited in *Sowers* about that counterclaim situation. That case is [*Roboserve Limited vs. Tom's Foods, Inc.*, 940 F.2d1441, 1447 (11th Cir. 1991)].

But the court's understanding of the charge and of the verdict form that was submitted to the jury by agreement is that the jurors are instructed to deliberate discrimination separately from retaliation, and then, if they have concluded, meaning, if their answers are yes to Questions 1, 2, and 3 under discrimination and/or 1, 2, 3, and 4 under retaliation, then they reach the issue of damages.

(Doc. 177, pp. 14–17).  Ultimately, the Court denied the City's motion for a complete mistrial and gave the jury an *Allen* charge.  (Doc. 177, pp. 19, 23–24).

Three hours after receiving the *Allen* charge, the jury posed a third question. (Doc. 160; *see also* Doc. 177, pp. 31–32).  The jury stated: "We the Jury have reached consensus on one claim that we have been tasked to completion including compensation amounts.  But we are grid locked on the second claim and have had no movement towards resolution in this matter since day one of deliberations.  How should we proceed?"  (Doc. 160; Doc. 177, pp. 31–32).

In response to the jury's question, Mr. Minnifield moved for a partial mistrial, arguing that the Court could accept a partial verdict because it was "possible for the jury to reach a different conclusion but not inconsistent verdicts on the race and retaliation claims."  (Doc. 177, pp. 32–33).  The City moved again for a complete mistrial and cited *Gasoline Products Company v. Champlin Refining Co.*, 283 U.S. 494 (1931), for the proposition that "the damages are so intertwined that this cannot

be cured with a partial mistrial." (Doc. 177, p. 33). The Court denied the City's

motion and granted Mr. Minnifield's motion for partial mistrial. (Doc. 177, p. 35).

The Court explained:

> For the reasons stated earlier, the court finds that the *Sanchez* case
> identifies a district court's discretion to take a partial verdict.[11] The
> Court, again, as stated earlier, understands the City's arguments about
> damages. The court is not persuaded that the adverse employment
> action issue in the two claims is the same.
>
> The court is not persuaded that the intent elements are the same for the
> two claims. The court believes that, under Eleventh Circuit law, those
> two aspects of the case are entirely distinct. Well, there's overlap in
> evidence, but the legal questions are distinct.
>
> With respect to damages, the court understands the City's concerns and
> understands the analysis in the *Gasoline Products* decision but believes
> that there are tools available and – pursuant to Rule 1 – to pursue the
> efficient conclusion of this case that has been pending since 2016, the
> court will accept a partial verdict from the jury.

(Doc. 177, pp. 34–35) (emphasis added).

The jury returned a verdict for Mr. Minnifield on his retaliation claim but did

not reach a unanimous verdict on his race discrimination claim. (Doc. 161; Doc.

177, pp. 37–39). The jury awarded Mr. Minnifield $3,497.76 per month for lost

overtime wages and benefits and $125,000 in emotional distress damages. (Doc.

161, p. 4). The parties stipulated that there are 125 months between July 2013, when

the City denied Mr. Minnifield the K-9 patrol position, and December 6, 2023, when

---

[11] *Sanchez v. City of Chi.*, 880 F.3d 349, 361 (7th Cir. 2018).

the jury reached its verdict.  (Doc. 163).  The City reserved "all objections it placed on the record as to how to cal[cula]te backpay and when backpay should be cut-off." (Doc. 163, p. 1) (brackets added).  In accordance with the jury's verdict, the Court entered judgment in favor of Mr. Minnifield on his retaliation claim for $562,220. (Doc. 187).

The Court then granted Mr. Minnifield's motion to sever, severed Mr. Minnifield's race discrimination claim from his retaliation claim, and instructed the Clerk of Court to assign a new civil action number to Mr. Minnifield's race discrimination claim.  (Doc. 186, pp. 6–7).  Mr. Minnifield dismissed his race discrimination claim.  *See Minnifield II*, 2:24-cv-00963-MHH, Dkt. Nos. 5, 8.

## III.

In its Rule 59 motion, the City argues that the Court erred in denying the City's motion for a mistrial.  (Doc. 200).  Pursuant to Rule 59(a), the City asks the Court to vacate the final judgment in this matter and order a new trial on Mr. Minnifield's race discrimination and retaliation claims because the Court's grant of a partial mistrial violates the Seventh Amendment's Reexamination Clause.  (Doc. 201, pp. 16–20).  Alternatively, pursuant to Rule 59(a), the City asks the Court to order a new trial because, the City argues, the jury's damages award is not supported by the evidence.  (Doc. 201, pp. 20–25).  Finally, pursuant to Rule 59(e), the City argues

that the Court should alter its previous judgment because the jury's award of damages should be limited to a 24-month period.  (Doc. 201, pp. 25–31).

## A. Rule 59(a) - the Seventh Amendment's Reexamination Clause

The Seventh Amendment provides that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according the rules of the common law."  U.S. Const. amend. VII.  The second clause is called the Reexamination Clause.  *Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 1127 (11th Cir. 2020) (citing *Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*, 858 F.3d 666, 675 (1st Cir. 2017)). The Reexamination Clause is "more accurately described as the 'Anti-Reexamination Clause' because it protects the flank of the Jury Trial Clause by forbidding reexamination in any federal court of a 'fact tried by a jury' other than according to the rules of common law."  *Sowers*, 975 F.3d at 1129.

In *Gasoline Products Company*, the United States Supreme Court analyzed whether the Reexamination Clause prohibits a federal court from ordering a new trial of a single issue.  *Gasoline Prods.*, 283 U.S. at 496–97.  In that case, the plaintiff sued "to recover royalties alleged to be due under a contract" under which the plaintiff licensed the defendant to use equipment in the production of gasoline.  283 U.S. at 495.  The defendant asserted counterclaims based on two alleged oral

contracts. *Gasoline Prods.*, 283 U.S. at 496. The jury returned a verdict in favor of the plaintiff for unpaid royalties and a verdict for the defendant on the counterclaim. *Gasoline Prods.*, 283 U.S. at 497. The district court ordered a new trial only as to the question of damages. *Gasoline Prods.*, 283 U.S. at 496.

On appeal, the Supreme Court explained that "where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again." *Gasoline Prods.*, 283 U.S. at 499. The Supreme Court determined that a jury could not "fix the amount of damages unless also advised of the terms of the contract" and other relevant facts, so the district court should not have ordered new trial only on the issue of damages. *Gasoline Prods.*, 283 U.S. at 499. The Supreme Court held that a court may order a partial new trial when "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods.*, 283 U.S. at 500. As the Eleventh Circuit stated in *Sowers*, "[s]eparability is the key." *Sowers*, 975 F.3d at 1130.

Here, Mr. Minnifield's discrimination and retaliation claims are separable. While Title VII's substantive provision prohibits discrimination based on specific characteristics such as race, the statute's antiretaliation provision prevents an employer from retaliating against an employee for complaining of alleged Title VII

discrimination. 42 U.S.C. §§ 2000e-2, 2000e-3. These provisions "are not coterminous." *Burlington North. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

To prove a Title VII race discrimination claim, a plaintiff must show that he belongs to a protected class, he was qualified to do the job, and he suffered an adverse employment action because of his race. *Lewis v. City of Union City*, 934 F.4th 1169, 1185 (11th Cir. 2019) (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)); (Doc. 172, pp. 48-50). To prove a Title VII retaliation claim, a plaintiff must show that he engaged in a protected activity and suffered an adverse employment action, and the plaintiff must establish a causal between the protected activity and the adverse action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001); (Doc. 172, pp. 50-53). As noted during trial, though both claims require evidence of an adverse employment action, the adverse employment action standard differs between the two.

Adverse actions for Title VII race discrimination claims are "things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Monaghan*, 955 F.3d at 860. To prove an adverse action for a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged conduct materially adverse, which in [the

retaliation] context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *White*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (brackets added). The retaliation standard "does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge.'" *White*, 548 U.S. at 69. The focus is on "the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *White*, 548 U.S. at 69.

Through counsel, Mr. Minnifield argued to the jury that his retaliation claim was "really where the heat of the case" was. (Doc. 172, p. 121). Though the damages Mr. Minnifield sought to recover for his race discrimination and retaliation claims were the same, the claims were distinct. The evidence for the retaliation claim began with Mr. Minnifield's protected activity. Whether the City actually discriminated against Mr. Minnifield or not, Mr. Minnifield reasonably believed that the City had engaged in racial discrimination, and he complained internally through a grievance and externally through an EEOC charge.[12] The City stipulated to this protected activity. (Doc. 161, p. 3; Doc. 172, p. 51).

For the next element of Mr. Minnifield's retaliation claim, the Court charged the jury: "If a reasonable employee would be less likely to complain about or oppose

---

[12] The "jury [did not] have to consider 'the nature of the discrimination that led to the filing of [Mr. Minnifield's grievance or his EEOC] charge'" to determine that the City retaliated against Mr. Minnifield. *See White*, 548 U.S. at 69 (brackets added).

alleged discrimination because he knew the City would deny him a posted position for which he applied, if he complained, then that action is an adverse employment action." (Doc. 172, p. 52). Mr. Minnifield demonstrated that he did not receive a K-9 patrol position, even though he was qualified for the position, and he argued that the BPD's refusal of that position in retaliation for his protected activity would make a reasonable employee reluctant to assert a charge of discrimination. (Doc. 172, pp. 122–23). Mr. Minnifield argued that BPD made an example of him "to show this is what happens if you complain." (Doc. 172, p. 123). The jury found that Mr. Minnifield satisfied the adverse employment action element of his retaliation claim because the jury found that the BPD's conduct would have made a reasonable employee reluctant to make a charge of discrimination. (Doc. 161, p. 3).

To prove that the City acted with retaliatory intent when it overlooked him for the K-9 patrol positions that the BPD filled in 2013, Mr. Minnifield produced evidence that his superiors made comments to him regarding his EEOC charge and grievances. For example, the trial evidence shows that after Mr. Minnifield filed his EEOC charge, Deputy Chief Duff told Mr. Minnifield that he should have "sugar on his lips and love in his heart." (Doc. 171, p. 29). Deputy Chief Duff also told Mr. Minnifield that the Birmingham Police Department "was not a democracy" and that Mr. Minnifield would not be getting what he wanted. (Doc. 171, p. 29). Mr. Minnifield testified that Captain Irby and Deputy Chief Duff showed his grievances

to other officers.  (Doc. 171, p. 29).  The evidence demonstrates that Lieutenant Blanton told Mr. Minnifield and his fellow officers that the BPD was not "afraid of no one in [t]here filing any grievances and EEOC complaints."  (Doc. 171, p. 30) (brackets added).  Again, the jury found that Mr. Minnifield satisfied this element of his retaliation claim.  (Doc. 161, p. 3).

And Mr. Minnifield argued that he "incurred damages because he did not receive one of the K-9 patrol positions that the tactical unit filled in 2013" and that the damages for his retaliation claim were the same as the damages for his discrimination claim.  (Doc. 172, p. 129).  Mr. Minnifield relied on his testimony that he lost at least $42,000 a year in overtime wages, (Doc. 171, pp. 54–55), and testimony that officers in the K-9 unit had many more hours of overtime than other groups in the tactical unit.  (Doc. 172, pp. 113-14; *see also* Doc. 172, pp. 61–62, 80). Mr. Minnifield pointed out that the City could have produced pay records for K-9 patrol officers to contradict the evidence that Mr. Minnifield presented about overtime hours, but the City chose not to present those records.  (Doc. 172, pp. 81– 82, 114).[13]  Counsel for Mr. Minnifield argued that a loss of $42,000 in overtime annually converted to a loss of $3,500 monthly.  (Doc. 172, p. 113).  The jury awarded Mr. Minnifield $3,497.76 per month in lost overtime wages and benefits,

---

[13] As noted, Mr. Minnifield's evidence established that the City had those records.  (*See*, *e.g.*, Doc. 200-2, p. 30).

and the jury awarded him $125,000 in compensatory damages for his mental anguish. (Doc. 161, p. 4).

In short, Mr. Minnifield's Title VII retaliation claim was not dependent upon a jury's finding of race discrimination, and the evidence that Mr. Minnifield relied upon to prove that he suffered an adverse employment action because the City retaliated against him was distinct from the evidence Mr. Minnifield introduced to prove his race discrimination claim. Therefore, the City is not entitled to a new trial on Mr. Minnifield's retaliation claim under the Reexamination Clause of the Seventh Amendment. *Gasoline Prods.*, 283 U.S. at 499.

## B. Rule 59(a) - Proof of Damages

The City argues that the Court should award a new trial because the record does not support the damages awarded to Mr. Minnifield. (Doc. 201, pp. 20–21). The City contends that Mr. Minnifield's damages testimony was "speculative" and forced the jury to engage in "guesswork" to determine the proper award of back pay. (Doc. 201, pp. 20–21).

"[T]he purpose of Title VII" is "to make persons whole for injuries suffered on account of unlawful employment [retaliation]." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (brackets added). When a Title VII plaintiff suffers an economic injury, "the compensation shall be equal to the injury." 422 U.S. at 418 (citation omitted). A successful Title VII plaintiff is "presumptively entitled to back

pay." *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 789 (11th Cir. 1999). "Back pay is 'the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the [retaliation], the individual would have attained.'" *Akouri v. Fla. Dep't of Transport.*, 408 F.3d 1338, 1343 (11th Cir. 2005) (quoting *Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1119–20 (3rd Cir. 1988)). "Back pay" includes an individual's straight salary, along with other benefits of employment such as "[i]nterest, overtime, shift differentials, and fringe benefits such as vacation and sick pay." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir. 1986) (quotation omitted). "Unrealistic exactitude is not required as the back-pay calculation may be based on just and reasonable inference of the missing or imprecise figure." *Gryder v. Dennin*, 427 Fed. Appx. 844, 867 (11th Cir. 2011) (quoting *Akouri*, 408 F.3d at 1344).

At trial, "a Title VII plaintiff bears the initial burden of establishing economic injury resulting from the adverse employment action." *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1361 (11th Cir. 1982) (collecting cases). "To satisfy [his] burden, the plaintiff must present some evidence from which the factfinder can reasonably calculate a back-pay award, which, at minimum, requires evidence of the plaintiff's earnings during her employment." *Collins v. Koch Foods, Inc.*, No. 20-13158, 2022 WL 1741775, at *4 n.3 (11th Cir. May 31, 2022) (citing *Akouri*, 408 F.3d at 1344) (brackets added). "Once a plaintiff in a Title VII case has established a prima facie

case and established what he or she contends to be the damages resulting from the [retail]atory acts of the employer, the burden of producing further evidence on the question of damages in order to establish the amount of" lost wages "properly falls to the defendant." *Marks v. Prattco*, Inc., 633 F.2d 1122, 1125 (5th Cir. 1981) (first citing *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir. 1978); then citing *Sprogis v. United Airlines*, 517 F.2d 387, 392 (7th Cir. 1975)).[14] Courts must resolve uncertainties in the calculation of backpay against the employer who violated Title VII. *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 260–61, 261 n.149 (5th Cir. 1974) (citing *Johnson v. Goodyear Tire and Rubber Co.*, 491 F.2d 1364, 1380 n.53 (5th Cir. 1974)); *see Jepsen v. Fla. Bd. of Regents*, No. TCA 74-0177, 1983 WL 30285, *16 (N.D. Fla. Aug. 31, 1982) (citing *Pettway*, 494 F.2d at 260) ("When claims for backpay are based on a deprivation of promotions and concomitant opportunities, the court must make a reasonable award based on the available data; absolute certainty is not expected.").

As to damages, the Court charged the jury:

You should consider the following elements of damage, to the extent you find that Mr. Minnifield has proved them by a preponderance of the evidence, and no others:

---

[14] Fifth Circuit decisions issued before September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc). *Marks* was issued on January 5, 1981. *See Marks*, 633 F.2d at 1122.

> net lost overtime wages and benefits from the date of denial of the
> K-9 patrol position to the date of your verdict;
> . . .
>
> To determine the amount of Mr. Minnifield's net lost overtime wages
> and benefits, you should consider evidence of any actual wages he lost
> and any monetary value of any benefits he lost because he did not
> receive one of the K-9 patrol assignments that the Tactical Unit made
> in 2013.

(Doc. 157-2, pp. 12–13). "The preponderance standard is one of widespread and
longstanding use." *United States v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021)
(first citing *Concrete Pipe & Prods. Of Cal., Inc. v. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602, 622 (1993); then citing *United States v. Trainor*, 376 F.3d 1325, 1331
(11th Cir. 2004)). "'A preponderance of the evidence is evidence which is more
convincing than the evidence offered in opposition to it.'" *Watkins*, 10 F.4th at 1184
(quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997)).

As discussed above, Mr. Minnifield relied on his testimony regarding the
amount of overtime that he could have earned annually if he had received a K-9
patrol position, and he relied on testimony from several officers about the ability of
K-9 patrol officers to earn overtime wages, particularly with on-call overtime hours.
(*See* Doc. 171, p. 54; Doc. 175, pp. 38, 44, 131–36; Doc. 200-2, pp. 29–30).  For
example, Deputy Chief Pruitt testified that K-9 officers - patrol and TSA - reported
more overtime hours on their time logs than other officers.  (Doc. 170, pp. 119–20).
The evidence reflects that K-9 officers typically had two to three pages of overtime

in a pay period; other officers logged one page of overtime for the same period. (Doc. 171, pp. 120–24, 154). Deputy Chief Wilson testified that K-9 officers earned a lot of overtime hours. (Doc. 200-1, pp. 17–19, tp. 65–70).

Officer Davis, who worked as a K-9 patrol officer and as a TSA K-9 officer, stated that he earned approximately $75,000 as a K-9 patrol officer and $100,000 as a TSA K-9 officer. (Doc. 175, p. 73). He also stated that when he became a K-9 patrol officer, he received on-call time for one week each month. (Doc. 175, pp. 36–37, 62–63). On-call time produced between 10 and 12 extra hours of pay per month, and potentially more if an officer had to report for duty while on call. (Doc 175, pp. 38, 44). While on call, officers earned their hourly rate until the officers exceeded 80 hours for a pay period. (Doc. 175, pp. 44–45). The City paid officers at a rate of time and a half for hours worked in excess of 80 hours during a pay period. (Doc. 175, pp. 44–45). In addition to on-call time, K-9 patrol officers worked special events like football games, parades, and races. (Doc. 175, pp. 45–47).[15] As noted, counsel for Mr. Minnield explained to the jury that a loss of $42,000 in overtime annually translated to a loss of $3,500 monthly. (Doc. 172, p. 133).

Once Mr. Minnifield established what he contends are his damages, "the burden of producing further evidence on the question of damages in order to

---

[15] Mr. Minnifield stated that he also lost the opportunity to qualify for the Drop Program if he retired as a K-9 handler. (Doc. 171, p. 55). He testified that the missed opportunity caused him to lose $100,000. (Doc. 171, p. 55).

establish the amount of" lost wages "properly [fell]" to the City. *Marks*, 633 F.2d at 1125. The City did not produce evidence to refute Mr. Minnifield's damages evidence or to allow the jury to calculate damages with greater mathematical specificity. The City could have introduced wage evidence for officers who served as motorscouts and as K-9 patrol officers in 2013, but the City elected not to do so. Given the City did not offer evidence to contradict Mr. Minnifield's damages evidence, it was not difficult for Mr. Minnifield to satisfy the preponderance standard and persuade the jury that his damages evidence was more convincing than the City's damages evidence.

Because Mr. Minnifield proved by a preponderance of the evidence that he was entitled to the overtime wages he requested, the City is not entitled to a new trial based on the damages evidence in this case. *See Watkins*, 10 F.4th at 1184; *Lipphardt*, 267 F.3d at 1186; *Vizcay*, 826 F.3d at 1326. Accordingly, the Court denies the City's motion for a new trial.

## C. Rule 59(e) – the Timeframe for Back Pay

"Generally, a Title VII plaintiff can recover back pay only for the period the plaintiff is 'available and willing to accept substantially equivalent employment' elsewhere; courts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the backpay award." *Lathem*, 172 F.3d at 793 (quoting *Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir. 1985)). Once a plaintiff has proven

"economic loss resulting from the adverse employment action," the defendant must prove by a preponderance of the evidence that some "change in circumstances" should limit the award of back pay. *Walker*, 684 F.2d at 1361; *Munoz v. Oceanside Res., Inc.*, 223 F.3d 1340, 1350 (11th Cir. 2000).

During the charge conference at trial, the Court heard argument from the parties concerning the proper cutoff date for back pay compensation. (Doc. 172, pp. 9–18). Mr. Minnifield relied heavily on *Collins v. Koch Foods*, No. 20-13158, 2022 WL 1741775 (11th Cir. May 31, 2022). Ms. Collins worked as a Human Resources Manager at a chicken processing plant. During her employment, she began living with the plant manager. *Collins*, 2022 WL 1741775, at *1. The company had an anti-fraternization policy that prohibited managers and supervisors from engaging "in intimate relationships with anyone under their direct or indirect supervision." *Collins*, Case No. 20-13158, 2022 WL 1741775, at *1. The processing plant's manager was not Ms. Collins's direct or indirect supervisor. *See Collins*, 2022 WL 1741775, at *1.

Nonetheless, when the HR director learned of Ms. Collin's living arrangement, he transferred her from the chicken processing plant to the nearby deboning plant. *Collins*, 2022 WL 1741775, at *1. The HR director then revised the anti-fraternization policy "to prohibit employees who worked in the human resources department from having a romantic relationship with any other employee

at the same facility or complex, regardless of whether they have supervisory authority over that employee." *Collins*, 2022 WL 1741775, at *1.

Later, when Ms. Collins applied for the Complex HR Manager position, she "was not considered for the promotion because of her relationship with" the processing plant manager. *Collins*, 2022 WL 1741775, at *2. Around that same time, the plant manager with whom Ms. Collins lived "was promoted to a newly created position of Plant Manager over" the processing plant and the deboning plant. *Collins*, 2022 WL 1741775, at *2. Soon afterwards, Ms. Collins and the plant manager married. *Collins*, 2022 WL 1741775, at *2. The company then terminated Ms. Collins for violating "the revised anti-fraternization policy." *Collins*, 2022 WL 1741775, at *2.

Ms. Collins sued Koch Foods for Title VII gender discrimination. She asserted that she suffered adverse employment actions because she was not considered for Complex HR Manager position and because Koch Foods terminated her employment after she married the plant manager. *Collins*, 2022 WL 1741775, at *1–2. During trial, Ms. Collins "submitted evidence of her salary, bonuses, and benefits as a Human Resources Manager and the estimated salary range, raises, bonuses, and benefits if she had been promoted to be a Complex Human Resources Manager." *Collins*, 2022 WL 1741775, at *2. For backpay, she asked the jury to award her the difference between her salary and benefits as HR Manager and the

salary she would have received as the Complex HR Manager. *Collins*, 2022 WL 1741775, at *2. "The district court instructed the jury that any award of back pay should be calculated from the date of the denial of the promotion 'to the date of [the jury's] verdict.'" *Collins*, 2022 WL 1741775, at *2 (brackets in *Collins*). Koch Foods jointly proposed the instruction and therefore did not object to the instruction as charged. *Collins*, 2022 WL 1741775, at *2. A special interrogatory on the verdict form provided the "to the date of the jury's verdict" language. *See Collins*, 2022 WL 1741775, at *3.

The jury found for Ms. Collins on her failure to promote claim and awarded her $262,000 in back pay. *Collins*, 2022 WL 1741775, at *1, *3. Koch Foods moved for a remittitur and asked the district court to reduce the back pay award. *Collins*, 2022 WL 1741775, at *3. The district court granted the motion, and Ms. Collins appealed. *Collins*, 2022 WL 1741775, at *3.

On appeal, the Eleventh Circuit explained that Ms. Collins "carried her initial burden to prove economic loss by presenting evidence of her actual salary and benefits as the Human Resources Manager and the salary and benefits she reasonably would have expected to receive as the Complex Human Resources Manager." *Collins*, 2022 WL 1741775, at *4. The law presumed that Ms. Collins's economic losses continued up to the date of judgment, and the burden shifted to Koch Foods to prove by a preponderance of the evidence that the economic loss "was cut off

because it would not have continued to employ Collins in the Complex Human Resources Manager position once it learned" that she married the plant manager. *Collins*, 2022 WL 1741775, at *4. Koch Foods did not present such argument to the jury, and the company "did not request a special interrogatory asking the jury to determine whether Koch Foods would have terminated Collins's employment . . . even if it had promoted her to the Complex Human Resources Manager position." *Collins*, 2022 WL 1741775, at *5 (ellipses added).[16] The Eleventh Circuit held that "under the particular factual and procedural circumstances presented here and the manner in which the back pay issue was tried to the jury in the district court, Koch Foods waived the issue of whether any back pay for its discriminatory denial of promotion to Collins based on her gender should be cut off as of July 25, 2017." *Collins*, 2022 WL 1741775, at *5.

Here, on direct examination, Mr. Minnifield testified that he retired from the City in July 2015 due to an on-the-job injury. (Doc. 175, p. 199). The City offered no evidence regarding the circumstances of Mr. Minnifield's retirement or his injury or the impact the injury may have had on his ability to work as a K-9 patrol officer. To the contrary, before trial, the City successfully urged the Court to exclude

---

[16] In addition, "Koch Foods did not object to the special verdict form or to the district court's jury instruction on compensatory damages, both of which explicitly instructed the jury that compensatory damages for lost net wages and benefits should be awarded 'to the date of your verdict.'" *Collins*, 2022 WL 1741775, at *5.

evidence of Mr. Minnifield's on-duty motorcycle injury to prevent juror confusion and prejudice. (Doc. 143, pp. 25–26; Doc. 178, pp. 36–37).[17] The City strategically opted to withhold from the jury evidence concerning the circumstances of Mr. Minnifield's retirement from the police force and chose not to draw attention to the topic in its arguments to the jury. Though the circumstances are somewhat different, as in *Collins*, "under the particular factual and procedural circumstances presented here and the manner in which the back pay issue was tried to the jury," the City "waived the issue of whether any back pay for its [retaliatory] denial of [a K-9 patrol position] to [Mr. Minnifield] based on [his protected activity] should be cut off as of July [] 201[5]," the date of Mr. Minnfield's motorcycle injury. *Collins*, 2022 WL 1741775 at *5 (brackets added).

The City relies on *Archambault v. United Computing Systems, Inc.*, 786 F.2d 1507 (11th Cir. 1986) to support its position. There, the defendant proved by a preponderance of the evidence the date by which the plaintiff's damages would have been cut off because the position at issue was eliminated. 786 F.2d at 1514–16; (*see* Doc. 201, p. 27). Here, to prove to the jury that Mr. Minnifield's motorcycle injury

---

[17] At the pretrial conference, counsel for Mr. Minnifield argued that the jury should be allowed to consider the emotional distress that Mr. Minnifield suffered following his career-ending on-duty injury on his motorcycle. (Doc. 178, p. 36). As discussed, the Court granted the City's motion in limine on this issue, finding that evidence of the motorcycle injury was "not an appropriate consideration for the jury" with respect to compensatory damages because it was "too remote and too speculative," and the Court was not "convinced that it [was] an appropriate measure of damages even for emotional distress damages in a Title VII case." (Doc. 178, pp. 45–46) (brackets added). Neither party raised the injury evidence as a cut-off for backpay at the pretrial conference.

would have prevented him from working as a K-9 patrol officer after July 2015, the City would have had to provide information about the accident to the jury.  In doing so, the City would have opened the door to evidence and argument that Mr. Minnifield would not have suffered a career-ending injury in 2015 if BPD had selected him for one of the K-9 patrol positions that the tactical unit filled in 2013. *Collins* is the governing authority under the circumstances of this case.  Under *Collins*, the Court may not cut off Mr. Minnifield's recovery as of July 2015.

**IV.**

For the reasons discussed, the Court denies the City's post-judgment motion. The Clerk of Court shall please TERM Doc. 200.

**DONE** and **ORDERED** this March 5, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE